## KLEIN *v.* HOFFHEIMER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 112. Argued November 14, 15, 1889. — Decided December 9, 1889.

A creditor of an insolvent debtor, having full knowledge of the insolvency, secured for himself a transfer of a large part of the notes, book accounts and debts of the insolvent. Other creditors by a proceeding which was part of the same transaction secured their debts by attachments sufficient to absorb all the property of the debtor. A creditor not included in the arrangement sued the debtor and by garnishee process brought in the creditor who had obtained the notes, etc. *Held*, (1), that the garnishee was bound to establish, as against the pursuing creditor, that his claim against the debtor was just, and that he will receive from the assets no more than is reasonably necessary to pay it; and, (2), if he is found liable at all as garnishee, he is liable to account not only for the money collected on the notes, accounts, etc., but also for the value of those which remain in his hands, at least to a sufficient amount to satisfy the debt of the pursuing creditor.

THE case is stated in the opinion.

*Mr. Martin F. Morris,* (with whom was *Mr. Leo N. Levi* on the brief,) for plaintiffs in error, cited : *Greenleve* v. *Blum,* 59 Texas, 124; *Ellis* v. *Valentine,* 65 Texas, 532; *Lewy* v. *Fischl,* 65 Texas, 311; *Bunn* v. *Ahl,* 29 Penn. St. 387; *Rice* v. *Perry,* 61 Maine, 145; *Horwitz* v. *Ellinger,* 31 Maryland, 492, 504; *Price* v. *Brady,* 21 Texas, 614; *Taylor* v. *Gillean,* 23 Texas, 508; *Tirrell* v. *Canada,* 25 Texas, 455; *Ellison* v. *Tuttle,* 26 Texas, 283; *Van Ness* v. *Hyatt,* 13 Pet. 294.

*Mr. George Hoadly,* for defendants in error, cited : *Chandler* v. *Von Roeder,* 24 How. 224; *Gregg* v. *Moss,* 14 Wall. 564; *Cooper* v. *Coates,* 21 Wall. 105; *Cannon* v. *Pratt,* 99 U. S. 619; *Mining Co.* v. *Taylor,* 100 U. S. 37; *Loder* v. *Whelpley,* 111 N. Y. 239; *Callan* v. *Statham,* 23 How. 477; *Walcott* v. *Almy,* 6 McLean, 23; *Hubbard* v. *Allen,* 59 Alabama, 283; *Hamilton* v. *Blackwell,* 60 Alabama, 545; *Harrell* v. *Mitchell,* 61 Alabama, 270; *Buchanan* v. *Buchanan,* 72 Alabama, 55; *Zel-*

*nicker* v. *Brigham*, 74 Alabama, 598; *Owens* v. *Hobbie*, 82 Alabama, 466; *Oppenheimer* v. *Halff*, 68 Texas, 409; *Jones* v. *Simpson*, 116 U. S. 609; *Hamilton* v. *Russell*, 1 Cranch, 309, 313; *Etting* v. *United States Bank*, 11 Wheat. 59, 74, 75; *Rhett* v. *Poe*, 2 How. 456; Privil. Lond. 197 (3d ed.) 255; *McDaniel* v. *Hughes*, 3 East, 367; *Walker* v. *Gibbs*, 2 Dall. 211; *Staples* v. *Staples*, 4 Greenl. 532; *Glenn* v. *Boston & Sandwich Glass Co.*, 7 Maryland, 287; *Tirrell* v. *Canada*, 25 Texas, 455; *Ellison* v. *Tuttle*, 26 Texas, 283.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Circuit Court for the Northern District of Texas.

Hoffheimer Brothers brought suit in the District Court of Dallas County, Texas, for a debt of $11,329.79, against Strauss & Levy, of that place, a firm composed of A. Strauss and J. J. Levy, in which suit they applied for and obtained a writ of garnishment against Frieberg, Klein & Co., who were residents of the same county and doing business in Dallas. This writ was served upon Frieberg, Klein & Co. through Joseph Seinsheimer, a member of the firm, in the county of Galveston, on the 15th day of August, 1885. The writ required the garnishees to answer upon oath "what, if any, they were indebted to said Strauss & Levy, and were when this writ was served upon them, and what, if any, effects of said Strauss they have in their possession, and what when the writ was served." To this they made the following answer on oath:

"Now come Frieberg, Klein & Co., garnishees herein, and, answering the writ of garnishment heretofore served upon them, say that they are not now indebted to Strauss & Levy, or either of them, and were not when this writ was served; that they have no effects of Strauss & Levy, or either of them in their possession, and had none when this writ was served; that they know of no person indebted to Strauss & Levy, or either of them, or who have in their possession effects belonging to Strauss & Levy, or either of them."

This answer was controverted by Hoffheimer Brothers, who

took issue upon it by a plea which alleged that said garnishees "combined, colluded, and confederated together with said Strauss & Levy for the purpose and with the intent to hinder, delay and defeat the creditors of said Strauss & Levy in the collection of their debts, and that in furtherance of said combination, at said time and with the intent aforesaid, said garnishees secretly and covinously procured and received from said Strauss & Levy all the books, accounts, notes, choses in action and other evidences of indebtedness then owing to said Strauss & Levy by divers and sundry persons to these plaintiffs unknown, but amounting in the aggregate to about the sum of thirty-two thousand dollars, and that said garnishees thereafter immediately commenced to collect said claims, pretending to be owners thereof. These plaintiffs are not informed as to the amount of such claims which had been collected by said garnishees at the time said writs of garnishment were filed herein, but they are informed and believe that at the time the writs of garnishment were served, as well as at the time the said answers were filed, said garnishees had then collected a very large amount upon said claims — it is believed more than sufficient to pay off and discharge the claims of these plaintiffs against said Strauss & Levy — and that the said garnishees then had and still have the money so collected, and that said garnishees then had in their possession said claims not so collected by them."

The case was afterwards transferred to the Circuit Court of the United States, and the plaintiffs having obtained judgment against Strauss & Levy for the sum of $11,787.15, a trial was had in that court before a jury on the issues made between Hoffheimer Brothers and Frieberg, Klein & Co., garnishees. In that trial the jury returned a verdict in favor of the plaintiffs for the sum of $11,329.79, and the court rendered judgment upon that verdict, and declared that when it should be paid or collected it should constitute a credit for that amount on the judgment in favor of plaintiffs against Strauss & Levy. It is to reverse this judgment that the garnishees, Frieberg, Klein & Co., have brought the present writ of error.

The errors assigned relate to the admission of evidence

against objections of plaintiffs in error, and to the charge of the court to the jury, and to the refusal to charge as requested by them. A bill of exceptions was taken which purports to give the proceedings on the trial, and which, while it does not expressly state that it includes all the testimony given in the case, is probably a correct statement of all that was said and done pertinent to the issues now presented.

It appears from this bill of exceptions that Strauss & Levy were engaged in Dallas as wholesale dealers in liquors and cigars on the 10th day of August, 1885, and were at that time seriously embarrassed in their business; that Frieberg, Klein & Co. were also wholesale dealers, in Galveston, Texas, with a house in Dallas; that Strauss & Levy were indebted to Frieberg, Klein & Co. by notes and accounts in the probable sum of about $15,000; and that on the 10th day of August aforesaid, just after dinner, Klein was in the office of Strauss & Levy, when Mr. Bradford, a lawyer, came in. He had a paper in his hand, and demanded payment of them of a claim not then due. They said they would pay it when due, and Bradford talked about suing them. Klein says he knew that Bradford was the attorney for the Bradstreet Commercial Agency, and he became alarmed, and demanded payment for the debt due his firm. They told him they had no money, but they had notes and accounts which they assigned to Frieberg, Klein & Co. in payment of their debt on his demand. The notes and accounts were assigned to Frieberg, Klein & Co. by a written instrument in which Strauss & Levy assigned and transferred to Frieberg, Klein & Co. in full payment and satisfaction of their indebtedness to that firm of the sum of $15,789, "all of our accounts mentioned on a sheet attached marked A, and the notes now held by Frieberg, Klein & Co. as collateral security, besides the notes this day handed Mr. Klein in person, which notes with aforementioned accounts, amount in the aggregate to the estimated value of $15,000." This instrument is dated the same day, August the 10th. Mr. Klein states that late on the night of the 10th a Mr. Rhinehart came to his house and showed him a telegram, and stated that Strauss & Levy were outside and wanted to know what to do

about their business matters. At their solicitation he went with them to the residence of Mr. L. M. Crawford, a lawyer, after one o'clock in the morning of the 11th. Mr. Crawford said that his papers were ready, and he was going to attach. It appears that during that night papers were prepared for attachment in favor of several creditors living in the town of Dallas. Among these attaching creditors were Marx & Kempner, Addie Lowenstein, Oliver & Griggs, and perhaps others. The order in which these attachments should be levied or issued so as to give priority among themselves was determined during these interviews, in all of which Mr. Klein took an active part, directing himself the displacement of this order of priority in one case to the dissatisfaction of Strauss & Levy when they found it out, who thus found some of their own friends, whom they intended to make safe by these attachments, postponed to some others; and it is obvious from the testimony, that Klein, and Strauss & Levy and Crawford, the lawyer, and some of the other parties to those suits sat down during that night and morning and arranged for the issuing of attachments sufficient in amount to absorb all the property owned by Strauss & Levy, and that Hoffheimer, and perhaps many other creditors, were left without protection and without any means of making their debts, so that between the time when Bradford, the lawyer, made his demand that evening, after dinner; and daylight next morning, all the assets of the partnership of Strauss & Levy had been divided between the parties who met that night, and that, not by any assignment, but by a contrivance by which Frieberg, Klein & Co. got the choses in action, whether notes or accounts due to Strauss & Levy, and the visible property was secured to the other persons engaged in the transaction by attachments issued with the consent and active assistance of Strauss & Levy, and apportioned among these different parties in accordance with an arrangement which met the assent of all of them. It will be observed that in the reply of Hoffheimer & Co., by which they took issue on the answers of the garnishees, they state that prior to the service of the writ of garnishment said garnishees combined, colluded and confederated together with

said Strauss & Levy for the purpose and with the intent to delay, defeat and hinder the creditors of said Strauss & Levy in the collection of their debts; and the question which came before the jury for trial turned upon the truth of this allegation. There is much other testimony in the bill of exceptions showing the interference of Klein, and occasionally of one of his partners, in the proceedings, by which this combination or conspiracy was carried out. Whether it is sufficient to establish it or not, it was for the jury to say, if they were properly instructed, and if no improper testimony was admitted. It is obvious that there is sufficient testimony to justify a jury in the inference that Mr. Klein was the presiding genius in the appropriation and distribution of the assets of Strauss & Levy.

Before we come to the matters on which the assignments of error are made, it is proper to make one or two things a little more clear than they seem at first sight. The transfer of the notes and accounts of Strauss & Levy to Frieberg, Klein & Co. was not an assignment to secure payment of the debt of the former to the latter, but it purports upon its face to be, and was treated by the parties throughout as, an absolute sale of those notes and accounts in full satisfaction of the debt due by the insolvent firm. The case is not to be treated, therefore, in its subsequent consideration, as one in which Frieberg, Klein & Co. held these notes and accounts as security for their debt, but as one in which they became the owners of them absolutely, if the transaction was fair and honest.

Another point to be considered is, how far this transfer or assignment of the notes and accounts was a part of the transaction by which the whole property of the insolvent firm of Strauss & Levy was appropriated during the twelve or fifteen hours within which the matter was completed. It is earnestly insisted by counsel for plaintiffs in error that the transaction between Klein and Strauss & Levy in the afternoon of the 10th was totally distinct from those which took place that night in regard to the attachments, and that therefore nothing said or done by Strauss or Levy, or by any of the parties, or their agents, whose attachments were levied after the execution of the paper transferring the notes and accounts to Frieberg,

Klein & Co., can be used as evidence against the validity of the transfer. If the entire proceedings of that afternoon and night are to be considered as one transaction, intended to distribute the assets of Strauss & Levy to certain creditors' to the exclusion of others, then whatever was said or done by any of those parties in regard to that transaction is evidence against all of them, and the acts of Mr. Klein in futherance of this combination, though some of them may have occurred after he had obtained the transfer of a part of the assets of Strauss & Levy to himself and partners, must be considered as part of the *res gestæ.* We are of opinion that the short time consumed in the whole transaction, the active interference of Mr. Klein in all its stages and in securing priority for certain friends of his, and of Strauss & Levy in the attachments, and the fact that the whole property of the insolvent debtors was intended to go to certain individuals to the exclusion of others, by consent of the parties engaged, constituted one transaction, in which Mr. Klein's acts and doings were part of the *res gestæ,* and as such are admissible evidence.

With these principles in view we approach the assignments of error, the first of which relates to the introduction of testimony objected to by defendants below. The testimony of John W. Edmondson, who was in the employ of Marx & Kempner, one of the firms whose attachments were included in the proceedings we have mentioned, stated that the suit and attachments of Marx & Kempner were filed by the authority of Klein, and that Klein, Strauss and Levy, and Crawford, the attorney, had told him so. He also said that in September, 1885, he had a conversation with Strauss and Levy, at which Klein and Marx were present. In that conversation Strauss and Levy said they had received from Hoffheimer Brothers on the 10th of August, about nine or ten o'clock at night, a telegram which referred to their matters in such a way as to alarm them. That they then went with the telegram to Klein, about one o'clock that night, and with Klein to the house of Crawford, the lawyer, and there conferred together. It was then agreed "between all of them that confidential debts should be attached for as follows: Crawford & Crawford, Marx & Kempner,

Wertheim & Schiffer, Oliver & Griggs and Addie Lowenstein. Crawford & Crawford were to come first and Marx & Kempner next; but Sam Klein had it fixed so that next day when the attachments were levied that of Oliver & Griggs was levied ahead of Marx & Kempner." "Some statements were made by Levy that the attachment was agreed on, in which August Cohn, brother-in-law of Levy, was endorser on one of the notes. Levy said that he had taken legal advice, and would knock all the attachments out of court and give away how the whole thing was done, and let none of the confidential debts be paid a dollar rather than Cohn should suffer."

There is much more of this, showing the secret arrangements by which the property of the insolvents was to be disposed of as the parties present had determined. Edmondson said that Klein, who was present, concurred in all that Strauss and Levy said. He further testified that Klein had said in that conversation that in consideration of the agreement of Marx & Kempner to hold August Cohn harmless, they gave Marx & Kempner a note of Cohn endorsed by Strauss & Levy and by Frieberg, Klein & Co.

The objection to this testimony seems to be upon the ground that Strauss and Levy, after they had parted with their interests in the property, could not, by their own confessions, or statements of the nature of the transaction, defeat the title they had transferred to Frieberg, Klein & Co. But it will be remembered that this conversation was in the presence of Klein, one of the defendants, and that the bill of exceptions states that he concurred in all that was said. It was therefore admissible against him and his partners as a statement which he agreed to at the time of the conversation, and which he should have contradicted if it were untrue.

With regard to the letter attached to Edmondson's deposition as an exhibit, from J. J. Levy to M. Marx, of the firm of Marx & Kempner, it might possibly be admissible, though written August 31st, twenty days after the attachment proceedings, as showing that Levy understood that in those proceedings his friend Cohn was to be taken care of. Otherwise it is entirely immaterial, and could not have worked the defendants any harm.

After the testimony of Edmondson, the deposition of H. Kempner, of the firm of Marx & Kempner, was introduced. He testified to a conversation with Mr. Klein in Galveston on the Sunday morning after the attachment suits had been instituted, in which he said: "Now, Mr. Klein, being that you were the leader and manager for the attachment suits, why is it that you did not carry out the instructions of Strauss & Levy, and put Marx & Kempner second in the order of attachment?" He replied that he felt in honor bound to put Oliver & Griggs ahead of Marx & Kempner, because he had recommended them for accommodation. He said that he had done all that he could for Marx & Kempner; that Strauss had insisted that Addie Lowenstein should be put in as a creditor in attachment for three thousand, but he, Klein, had objected, and it was compromised on the one thousand named in her suit. She is the sister-in-law of Strauss.

As this testimony relates to what Klein himself, one of the defendants, said, and as it tends to show his own recognition of the fact that he had been a controlling spirit in the attachment proceedings, we do not see what objection can be urged to it.

Objection is made to the testimony of Chapman Bradford, offered in rebuttal, to the effect that he had seen in the store of Pascal Tucker, in Brownwood, several barrels of whiskey marked S. & L., Dallas. This testimony seems to have been offered in rebuttal of the testimony of Klein, who had declared that Tucker had been book-keeper for Strauss & Levy, and had afterwards moved to Brownwood, and was keeping a store there; that "none of Strauss & Levy's goods were shipped to Tucker; he received none of them. I shipped all of them to Frieberg, Klein & Co., at Galveston." This was his own firm. So far as the testimony of Bradford tended to contradict this statement of Klein, no objection can be seen to its admissibility; and if neither Klein's testimony nor Brown's testimony is material to the issue, it seems to be so utterly useless that defendants could not be hurt by it.

Two principal objections are made to the charge of the court. The first of these, and perhaps the more important, is

that the court placed the burden of proof upon the garnishees to establish the fairness of the transaction by which they obtained possession of the notes and accounts of the insolvent debtors. The argument is that the defendants, by virtue of the statute, answered certain interrogatories which had been propounded to them in the garnishee process; that that answer is to be taken as evidence in their favor; and that, as they positively denied having any property or credits of the insolvent debtors in their hands, or being in any way indebted to them, this answer should stand as a *prima facie* case in their favor to be overcome by proof on the part of the plaintiffs. It is also true that in the traverse of this answer made by plaintiffs they set out the affirmative allegation that "prior to the service of the writ of attachment and writ of garnishment the garnishees combined, colluded and confederated together with said Strauss & Levy for the purpose and with the intent to hinder, delay and defeat the creditors of said Strauss & Levy in the collection of their debts, and that in furtherance of said combination, at said time and with the intent aforesaid, said garnishees secretly and covinously procured and received from said Strauss & Levy all the books, accounts, notes, choses in action, and other evidences of indebtedness then owing to said Strauss & Levy by divers and sundry persons to these plaintiffs unknown, but amounting in the aggregate to about the sum of thirty-two thousand dollars, and that said garnishees thereafter immediately commenced to collect said claims, pretending to be owners thereof." If this allegation is not true in substance, the plaintiffs had no case against Frieberg, Klein & Co., and the burden of the issue was, therefore, primarily upon them. But Klein and another member of that partnership were sworn as witnesses, and what they said as witnesses, being minutely descriptive of what was done, is much more important in ascertaining the truth than their general denial that they held the property of the insolvent debtors or owed them anything. In the testimony of Klein himself it was made very clear that he was aware, at the time of the transaction by which he obtained their choses in action, that Strauss & Levy were insolvent, or at least were in failing

circumstances and unable to pay their debts; and that he received from them all or nearly all of the notes and accounts due them, and professed to take them in payment of the debt of his firm. It was not unreasonable, therefore, that the court should charge that, under these circumstances, Klein and his partners should establish the fairness of the proceeding by which they came into the possession of these notes and accounts.

The substance of the charge of the court, of which complaint is made, is, that "if the jury believe from proof in the case that plaintiffs had a valid, existing, unsatisfied claim against Strauss & Levy for something over eleven thousand dollars, and that Strauss & Levy were insolvent on the 10th day of August, 1885, and that Klein knew, or might have known, that fact, and that under the circumstances he on behalf of garnishees took the bills receivable, and that garnishees had received and collected the sum of nearly ten thousand dollars, and have still uncollected bills of value, you will find the garnishees liable, *unless* you believe also from the proof that the garnishees were, in fact and in good faith, creditors of Strauss & Levy in the full sum claimed by said garnishees, and that the dealings of Klein on behalf of the garnishees, with Strauss & Levy, on the 10th day of August, were, in fact, fair and honest and had with a single purpose of obtaining satisfaction of their debt, and that he received no more therefor than was reasonably worth the amount of said garnishees' said debt." We think that this was a fair statement of the law on the subject. The whole case was before the jury. The insolvency of Strauss & Levy was known, or might have been known to Klein, and, therefore, when he undertook to deal with the assets of this insolvent firm by taking a very large part of it in payment of his own debt, a circumstance which he knew must leave many other creditors either wholly or partly unprotected and without means for payment, it was proper that all his dealings in that matter should be fair and honest; that his claim should be a just one; that he should receive no more than what was reasonably necessary to pay his debt; and that if the transaction was tainted with any

fraud or unjust. interference with the rights of creditors it
should not stand.   In other words, the preliminary statement
of those facts made a case which required of the garnishees a
fair and satisfactory explanation of the remarkable proceedings
of Mr. Klein and his partners in the whole transaction.

The language we have cited also shows that there is no
ground for the argument of counsel that the jury were in-
structed that if the garnishees received anything more, even a
dollar, than was due to them of the assets of the insolvent
debtors, the transaction was therefore void.   Fair play and
honest dealing did require that while they had the right, as is
admitted by the court, to secure their debt or to take payment
for it provided it, was done fairly and honestly, and that
Strauss & Levy had a right to pay them out of their assets in
preference to other creditors, yet it was right and proper that
they should take no more of these assets in which other credi-
tors were interested than was, in the language of the court,
"reasonably worth the amount of the garnishees' debt."   Of
course this reasonable amount did not mean that it should be
measured to a dollar or to a cent.   It did not mean if what
they took turned out to be worth a little more than their debt,
if the notes and accounts yielded a little more than the debt
in the end, that thereby the whole transaction was to be void,
but it meant, and that we think was sound law, that in pres-
ence of the circumstances under which the transfer was made,
if defendants took more than what appeared to be reasonably
worth the amount of their debt, it was a fraud upon the other
creditors; and the court, in giving the converse of this prop-
osition, said that if the garnishees on that day received no
more from the insolvent debtors than was reasonably suffi-
cient to satisfy their claim, the jury were to find for the
garnishees.

The court also instructed the jury that if they found for the
plaintiffs, they were to return a verdict for the amount of money
shown by proof to have been received by the garnishees and
the value of the uncollected bills, if the sum of these did not
exceed plaintiffs' debt.   It is said that the garnishees could
only be liable for the sum which they had actually collected

out of these notes and accounts, and that, as to any of them remaining in their hands, they could not be held accountable in this proceeding. · If the transfer of these choses in action to the garnishees had been a fair assignment by way of security out of which they were to pay their debt, if so much of it could be collected, then the remainder of the choses in action, whether valuable or not, could be returned by them, without liability; but, as we have seen, the case goes upon the idea of a fraudulent conversion by Frieberg, Klein & Co. of assets of the insolvent debtors. By this fraud the control of the assets passed to them, and we are of opinion that, if liable at all, they were liable not only for the money collected on such notes and accounts, but for the value of those which remained in their hands to at least, as the court instructed, an amount sufficient to pay the debt of Hoffheimer Brothers against Strauss & Levy. Whether there was, or not, such amount was a question left to the jury, and the jury found that there was. They must have found, under the instructions of the court, that enough of the assets collected remained in their hands, either ·in the shape of money collected or of notes and accounts yet uncollected but valuable, to pay the debt of Hoffheimer Brothers against Strauss & Levy. In this we see no error to the prejudice of the plaintiffs in error, and the judgment is therefore

*Affirmed.*