### TREUSCH et al. v. OTTENBURG et al.

(Circuit Court of Appeals, Sixth Circuit. February 6, 1893.)

#### No. 50.

1. FRAUDULENT CONVEYANCES—GARNISHMENT UNDER MICHIGAN STATUTE.

The garnishment process provided for in 3 How. St. Mich. § 8091, is not strictly limited to legal demands and remedies, but includes rights and relief of an equitable character, such as reaching the proceeds of property which may have been acquired by the garnishee fraudulently as against the creditors of the person from whom the same was acquired.

2. SAME—PROVINCE OF COURT AND JURY.

In a proceeding under this statute to reach the proceeds of property alleged to have been fraudulently conveyed, the court cannot direct a verdict for defendant when the evidence shows that the debtor made the conveyance with fraudulent intent, and also tends to prove that the garnishee not only had notice of the fraudulent purpose, but also participated therein.

3. SAME—EVIDENCE—ADMISSIBILITY.

In such an action it is proper to prove that the debtor made false statements to a commercial agency as to the extent and character of his assets and liabilities; and it is not necessary that such statements should have been made in the presence of the garnishee, for they tend to show fraud on the debtor's part, and the garnishee's connection with the fraud may be subsequently shown.

4. SAME.

In such an action, when the bona fides of the debt for which the goods were transferred is questioned, and both the debtor and the garnishee are charged with fraud, it is competent for the debtor's bookkeeper to testify as to the estimated value of his book accounts, and as to the

garnishee's visits to the debtor's store, and how the two conversed together.

**5. SAME.**

In an action under the Michigan statute the court charged, in effect, that a creditor who receives in payment for his debt property which his debtor has acquired fraudulently, is liable if he had notice of such fraud, while a creditor who accepts property honestly acquired by his debtor but transferred with intent to defraud creditors, must not only have notice of the fraudulent intent, but must participate therein. *Held,* that this charge was not open to the objection that it told the jury that defendant was chargeable because of mere notice of the debtor's fraudulent intent in making the transfer, although defendant did not participate therein, and his debt was an honest one.

In Error to the Circuit Court of the United States for the Southern Division of the Western District of Michigan. Affirmed.

Niram A. Fletcher and George P. Wanty, for plaintiff in error.
A. R. Rood, for defendants in error.

Before JACKSON and TAFT, Circuit Judges, and HAMMOND, District Judge.

JACKSON, Circuit Judge. The defendants in error, as partners under the firm name and style of S. Ottenburg & Bros., having brought suit in the circuit court on several claims and demands contracted in the spring and summer of 1891 by Jacob Lustig for goods and merchandise sold him, and, having obtained judgment thereon against said Lustig for the sum of $7,623.90, together with the costs of suit, thereafter applied for and caused to be issued a writ of garnishment against the plaintiffs in error, citizens of Michigan, and residents of Grand Rapids, in said state, for the purpose of reaching and subjecting to the payment of their said judgment funds and property, or the proceeds thereof, which it was claimed said garnishees either owed to said judgment debtor, or held by title or conveyance void as to his creditors, and which, under the laws of Michigan, was property applicable to the satisfaction of their judgment. No question is raised as to the correctness of the judgment against the principal debtor, nor as to the regularity of the garnishment proceeding, which conform to the statutes and practice of the state, under and by virtue of which the affidavit on which the garnishment is based constitutes the declaration or complaint, and the answer of the garnishee the defense, thus forming the issue for trial between the judgment creditor and the garnishee. While the matters or issues presented by the garnishment proceedings are triable at law before a jury, they are not limited or confined to strictly legal demands and remedies, but may involve and include rights and relief of an equitable character, such as reaching the proceeds of property which may have been acquired and appropriated by the garnishee fraudulently as against the creditors of the person from whom the same was received.

The statute of Michigan relating to the subject provides that, "if any person garnished shall have in his possession any of the property aforesaid of the principal defendant, which he holds by a conveyance

or title that is void as to creditors of the defendant, or if any person garnished shall have received and disposed of any of the property aforesaid of the principal defendant, which is held by a conveyance or title that is void as to creditors of the defendant, he may be adjudged liable as garnishee on account of such property, and for the value thereof, although the principal defendant could not have maintained an action therefor against him." 3 How. St. § 8091, enacted July 3, 1889. The supreme court of Michigan, in the case of Heineman v. Schloss, 83 Mich. 157, 47 N. W. Rep. 107, had occasion to construe this statute, and held that it enabled the creditor, by and through the agency of a garnishment proceeding, to reach and subject to the payment of his judgment against the principal debtor property or the proceeds thereof which the garnishee might hold by conveyance or title that was fraudulent as to creditors of such debtor, and that its effect was not to enlarge the liability of garnishees, but to render them liable at law in all cases where they could be reached in equity.

The garnishment proceeding in the present case was based upon that construction or view of the statute, and sought to charge the plaintiffs in error with the value or proceeds of property, consisting of tobacco and cigars, which it was claimed that Jacob Lustig, the principal debtor, had, in 1891, sold and transferred to them fraudulently as against his creditors. The sales and transfers of tobacco and cigars specially attacked as fraudulent amounted to about $13,199.00, and extended over a period of about four months; that is, from the latter part of March to the middle of July, 1891. There was a verdict and judgment against the garnishees, to reverse which the present writ of error is prosecuted.

The issues of fact presented were: First, whether in making said sales the principal debtor, Jacob Lustig, intended to defraud his creditors; and, secondly, whether the plaintiffs in error were so connected with such fraudulent intent as to render said sales or the title acquired by them void as against the vendor's creditors. Upon the first question there is little or no controversy. The testimony, with all the attendant facts and circumstances, leaves no room to doubt that said Lustig, both in making his purchases of goods on credit and in selling the same to plaintiffs in error, intended to defraud his creditors. Neither the charge of the court below on this branch of the case, nor the finding of the jury thereon, is complained of. But the errors assigned relate to the second issue of fact, and to the instructions given by the court to the jury in connection therewith. When the testimony was closed, the garnishees moved the court to direct a verdict for them. This the court declined to do. This refusal is assigned as error; the plaintiffs in error, by their counsel, insisting that the evidence did not warrant the court in submitting the case to the jury. A careful examination of the testimony as set out in the bill of exceptions fails to satisfy or convince us that this action of the court was erroneous. The evidence, with the inferences that might be legitimately drawn therefrom, fairly presented such a case or questions of fact as should have been submitted to the jury under proper

instructions from the court. Without undertaking to set forth in detail all the facts and circumstances disclosed by the testimony which constituted such badges or "indicia" of fraud on the part of plaintiffs in error as made it proper for the jury to pass upon the case, it will suffice to state by way of general outline what the evidence either established or tended to prove. The plaintiffs in error, under the firm name of Treusch & Bro., were wholesale cigar and tobacco merchants at Grand Rapids, Mich. Jacob Lustig, the principal debtor, was their brother-in-law, and was taken into their employment in 1885 at a salary of $10 per week. This employment at said wages continued until January, 1888, when the plaintiffs in error started a branch business in their store, called the Lustig Cigar Company, in which said Lustig was given or allowed one third of the net profits in consideration of his management and attention to the business of said company, the capital of which, consisting chiefly of tobacco and cigars, was furnished and supplied by the plaintiffs in error. This branch concern was not a success, and continued in existence until January 29, 1889, when the plaintiffs in error sold out the business to said Lustig, who thereafter conducted the same as sole proprietor. For the year it was in business prior to said sale the company seems to have made a net profit of $1,064.86. In order to enable Lustig to make said purchase, he was allowed the whole of said profit, less his overdrawn account, was loaned by one of plaintiffs in error the sum of $3,500, which, together with about $2,800 held by them for Lustig's wife, or in her name, was applied on the purchase price or consideration to be paid by him, and, in addition thereto, he executed his two notes for $1,000 each, due at 30 and 60 days. This transaction was entered upon the books of said Lustig and of plaintiffs in error in such way as to present the appearance of a purchase chiefly, if not entirely, for cash, and was calculated to create the impression that Lustig was worth and had invested in his business about $8,000. It is, however, shown that he was without means, that he had little or nothing, and that the plaintiffs in error knew this fact. After Lustig's purchase and the commencement of business as sole proprietor of the Lustig Cigar Company, one of the plaintiffs in error, upon being asked for information concerning Lustig's financial condition by a representative of Bradstreet's Commercial Agency, exhibited a statement of said transactions as shown by their books, and on which said agency based its report of said Lustig's means and standing. This representative of the Bradstreet Agency states that "the substance of what Treusch told me was that Lustig was worth in the neighborhood of $8,000, which he had invested in his business," which was substantially what the statement they furnished showed, and upon which said agency gave Lustig a rating of $5,000 to $10,000, by which was meant that he was estimated to be worth five to ten thousand dollars above his debts. The appellants are subscribers for and take the book of said agency, which they use in their business to get the commercial rating of parties with whom they deal or do a jobbing trade. In making said statement and report of Lustig's financial condition to said agency, the plaintiffs in

error did not disclose the actual facts of the transaction. They failed and omitted to state that Lustig had or purported to have borrowed from one of them $3,500, and from their firm about $2,800, which they held for his wife, to enable him to make the alleged purchase; and, further, that he was in fact worth nothing, although the transaction as entered on their books and furnished said agency showed that he was worth, and had invested in his business, fully $8,000. One of said firm further represented to said agency in June, 1891, that they were willing to extend said Lustig such credit as he might ask, which statement, the evidence tends to show, was not made in good faith.

Lustig, after making said alleged purchase, and commencing business on his own account, made still stronger representations as to his financial condition to the local manager of the R. G. Dun & Co. Commercial Agency, stating that his stock and fixtures inventoried $11,000, and that he had paid therefor $9,000 cash and given two notes for $1,000 each, and had then in bank to his credit $1,600. These representations were known to be untrue and false when made, and were, from time to time, repeated; but upon the basis of their correctness said Dun Agency gave him a rating of $5,000 to $10,000, with good credit. Both Lustig and plaintiffs in error well knew that he was not entitled to that rating. During the year 1889, Lustig, after settling in some way said two notes of $1,000 each, purchased goods to a considerable extent from the plaintiffs in error, in settlement of which he, on December 2, 1889, executed his note to them for $4,966.27, payable one year after date, with 7 per cent. interest. In addition to this, it is claimed that they loaned him $2,000 on October 23, 1889, at 90 days, which, after one renewal, was paid in merchandise. During this first year of business Lustig purchased moderately of other parties on credit. From March 1, 1890, to July 31, 1890, his purchases amounted to about $20,636.81. During the same period in 1891, or from March 1, 1891, to his failure, on July 18, 1891, he made purchases largely in excess of the requirements of his business, principally from 26 new houses, to the amount of $40,292, generally on four months' credit. There was testimony tending to show that his letters proposing purchases from these new houses or firms were suggested by one of plaintiffs in error, who was often during that period in secret and private conference with said Lustig. From January 29, 1889, to the date of his failure, as appears from his books, Lustig drew out of the business on his personal account over $10,000, which was never restored. Between March and the 18th of July, 1891, on goods purchased during that period, there was a shortage of 224,333 cigars,—a deficit by brands, amounting to over $6,000,—which is unaccounted for. In addition to this, other deficits are shown in his merchandise accounts, which are unexplained. It is shown that during March and April, 1891, 50 per cent., and in May and June, 1891, about 60 per cent., of Lustig's total sales were made nominally or really to the plaintiffs in error, who received from him during said months goods to the value of $13,199. It further appears that many of these goods were turned over and delivered to them in original

packages, just as they had been purchased by said Lustig, and that such packages were generally transferred from Lustig's store to the store of the plaintiffs in error at an hour of the day when no one was present in the former's store except himself, and that they were delivered and received at the back door of the Treusch's store. Lustig's business was chiefly retail, while that of plaintiffs in error was wholesale. The $13,199 worth of goods so received by plaintiffs in error from Lustig during the three or four months preceding his failure, it is said, were paid for by them partly in cash, partly in merchandise, and partly in notes,—the cash stated to have been paid by them being $1,340.90 in the latter part of June, 1891; the merchandise being stated at $1,214.24; and the balance in the notes of Lustig, one of which being for $4,966.27, given the firm of Treusch & Bro., December 2, 1889, and the other for $3,500, given January, 1889, to E. Treusch, who, it is alleged, turned the same over to said firm.

On July 18, 1891, when, as appears by his books, his stock inventoried about $10,000 and his accounts about $9,000, Lustig executed three mortgages thereon,—the first to secure a note of $4,000, indorsed by plaintiffs in error, and held by the Grand Rapids National Bank; the second, a note of $2,000, to Herman Lustig, a brother to Jacob Lustig; and the third to secure a note of $2,500 to J. R. Warner, a cousin of Lustig's wife and the Treuschs. Said stock and accounts were hurriedly sold under the latter mortgage about July 28, 1891, and bought by E. Treusch, for the plaintiffs in error, for the sum of $2,400, subject to the two prior mortgages, making the total purchase prices therefor about $8,400. The purchasers at once closed out the stock and fixtures at a profit of nearly $4,000, and still had on hand a majority of the accounts uncollected. There was no testimony showing who received the proceeds of the $4,000 note indorsed by plaintiffs in error and held by the Grand Rapids National Bank, nor was there any evidence as to the notes secured by the second and third mortgages to Lustig's brother and to the cousin of plaintiffs in error having been given for any valuable or bona fide consideration. Neither is it shown, by any testimony appearing in the record, that plaintiffs in error have ever settled or paid to said parties or any one the amounts of said notes. Said mortgages were executed shortly before Lustig's notes given for his heavy purchases in the spring of 1891 upon credit extended by new houses were maturing, and were manifestly made in contemplation of early suspension; and the circumstances, together with the course of dealing on the part of Lustig, fairly raised a presumption that they were fraudulent, and called for clear and satisfactory explanations.

Plaintiff in error Morris H. Treusch, in his examination as garnishee, states, among other things, that "when the $4,966.27 note was given he insisted upon prompt settlement every week or two, or every month. We insisted on no more notes, and that cash must be paid for the balance on either side, and this was done." It is stated by their bookkeeper that during the time said Lustig was in business the plaintiffs in error sold him goods to the amount of

$25,734.55, and that Lustig sold to them goods to the amount of $25,721.60, making a difference in their respective sales to each other of only $12.95. Said bookkeeper further states that during said period Lustig paid plaintiffs in error in cash only $6,125.63, while plaintiffs in error paid him in cash $14,502.72; a difference of $8,377.09. This is singular, to say the least of it, and no explanation is given of the matter.

It, however, appears that during the four months preceding his failure, plaintiffs in error sold Lustig goods to a very small and limited amount,—say about $41 worth in April, $22.18 in May, and $196.27 in June,—during which period they were purchasing goods from him by the wholesale, and in original packages, just as they were received by Lustig from the new wholesale houses with which he commenced dealing in the spring of 1891. There was testimony tending to show that E. Treusch put Lustig up to soliciting samples from, and to commence dealing with, such new houses, and that he sometimes took the samples of goods thus furnished Lustig, and afterwards, when Lustig would order and procure such goods, they would be turned over to plaintiffs in error, as already stated, in original packages. It appears from their books, as stated by Morris H. Treusch, that on January 3, 1889, the stock of goods which Treusch & Bros. had on hand amounted to $9,834.78. Since that date no inventory has been taken, nor does it appear that their stock or business has since been increased or enlarged.

It is further stated by said Morris H. Treusch that "we [plaintiffs in error] had some money invested in the Lustig Cigar Co., and it hadn't been a success." They sell this unsuccessful enterprise to their brother-in-law, whom they know to be without means. They enter the transaction upon their books in a way to present the appearance of his being worth over $8,000. They show this statement to Bradstreet's Commercial Agency when inquiry is made of them touching Lustig's financial condition, and thereby substantially represent that he is worth and has invested in his business about $8,000. That agency, with their knowledge, thereupon gives him a rating of $5,000 to $10,000, which they see, and, while knowing the same to be untrue, remain silent. They start the insolvent brother-in-law in business by furnishing credit and goods for awhile. They gradually draw out while he is obtaining credit with new houses. They encourage or suggest the extension of his purchases beyond the needs of his business. They, as wholesale dealers, buy from him, a retail merchant, chiefly, large quantities of goods within the three months preceding his failure, taking original packages by wholesale in many instances, and in a secret way. They keep and present no clear or satisfactory accounts of their dealings with their insolvent brother-in-law, who is a near neighbor, and with whom they maintain close business and family relations, and, after securing a large part of the goods he has fraudulently acquired with no intention on his part of ever paying for the same, they obtain the remnant of his stock and accounts under mortgages made just before failure, to secure themselves and their and his near relations in alleged indebtedness which is neither shown to have been

bona fide or valid, nor to have been paid by them.    There was proof tending to show the foregoing state of facts, and to establish the close connection of plaintiffs in error with the principal debtor and his fraudulent scheme and conduct.    Under such circumstances it would have been clearly improper for the trial court to have instructed the jury, as requested by plaintiffs in error, that there was not sufficient evidence on the question of fraud, so far as they were concerned, to go to the jury, who should, therefore, have been directed to return a verdict for them.

The next error assigned is to the action of the court in allowing the witness Ferguson to testify as to the statements made to him, as the agent of R. G. Dun & Co., by Jacob Lustig, in respect to the latter's financial condition, on which said Dun & Co.'s agency gave him a rating of $5,000 to $10,000.    This testimony was offered to establish fraud on the part of said Lustig, which was one of the facts to be shown by the plaintiffs below.    In admitting this testimony the court properly stated that Lustig's conduct and statements were not, in and of themselves, binding upon the plaintiffs in error, and could have no effect upon them, unless the same was substantially brought home to their knowledge; that it was necessary for the plaintiffs below to show a fraudulent intent not only on the part of Lustig, but also on the part of the garnishees, in order to succeed; and that if, in the end, the testimony failed to establish any fraudulent purpose on the part of either Lustig or the Treuschs, the action would fail.    The testimony was certainly competent in making out the fraud on the part of the principal debtor,—an essential fact in the proceeding,—without the establishment of which the cause would fail as against the garnishees, and which would only affect them by connecting them therewith, or bringing it home to their knowledge.    There is no valid objection to the order in which such testimony is introduced.    In the present case it appears from the testimony of the witness Idema, the representative of the Bradstreet Agency, that one of plaintiffs in error made substantially the same statement as to Lustig's financial condition, on which he was given the same rating as the Dun Agency had given him.    There is no merit in the objection made to the admission of this testimony, even if the exception thereto were in proper form.    Nor is there any error on the part of the trial court in permitting the witness Stebbins, a former bookkeeper of Lustig, to give an estimate of the value of his book accounts, and to testify as to Emanuel Treusch's visits to Lustig's store, and how they conversed with each other.    This testimony was clearly competent, and its weight, or the consideration to be given it in connection with the other evidence, was for the jury.

The next error assigned and mainly relied on for a reversal of the verdict and judgment below is that the lower court charged the jury that, although plaintiffs in error held an honest debt against Lustig, and received from him in payment therefor goods only to the actual amount of their debt, still, if they had notice that Lustig intended to defraud his other creditors, they could not obtain title to the goods they purchased, notwithstanding they did not partici-

pate in the fraudulent intent, and did not aid and abet or connive at such action on the part of Lustig. This assignment is not well taken. The charge, in its whole tenor and effect as given to the jury, and the court's modifications of the special instructions asked for, laid down no such legal proposition; on the contrary, the jury were distinctly told that plaintiffs in error must in some way have participated in Lustig's fraud in order to be affected by it.

There were two theories on which the plaintiffs in error were sought to be made liable: First, that there was a scheme and combination between them and Lustig, by which it was arranged and planned that the latter should obtain goods on credit, with no intention of paying therefor, and then turn over or sell the same to the former in fraud of creditors; and, secondly, that if said garnishees were not actually parties to such scheme of fraud on Lustig's part in the procuring of goods, which he had neither intention or ability to pay for, they had notice of and participated in his sale and disposition thereof with the intent and purpose of defrauding his creditors. The court instructed the jury upon both aspects of the case, as follows:

"The question of fact involved then upon this main branch of the case is divided into two specific branches: First, in regard to the intent of Lustig in making those purchases of the goods that were turned over to the Treuschs; and, second, as to whether the Treusch Brothers connived at Lustig's purposes, or had notice of the fraud on his part in buying and turning over to them those goods; because, gentlemen, the law is that, however so fraudulent the conduct of a debtor may be in acquiring the title to goods, and however his own motive may be, in turning them over to a creditor, unless that creditor has notice of the fraudulent purpose, or aids and abets in it some way,—in other words, if he is entirely innocent of all fraud himself, or knowledge of the intended fraud on the part of the debtor,—he is not responsible for it. He stands on his own merits, and is not to be condemned because of the fault of his debtor, not known to him. If Lustig bought a large stock of goods on credit, without intending to pay for them, or without having any expectation of being able to pay for them, and for the purpose of turning those goods over, so far as necessary, to Treusch Bros. in payment of his debts to them, and they were so turned over, and Treusch Brothers, or either of them, had notice that the goods thus received were so purchased by Lustig with the intent and purpose above stated, then you should find those goods came into the hands of the defendants unlawfully, for it would be a fraud upon creditors, and they would be chargeable with their value in this suit. Or if, without regard to the intent with which Lustig bought the goods, and independent of the question of his fraudulent purpose, if he had any, in buying these goods, after having got them by whatever means, honestly or otherwise, he turned the goods over to Treusch Brothers in payment of his debt to them, with intent to defraud his creditors, or as part of his scheme to defraud his creditors, and the Treusch Brothers, or either of them, had notice of such intent, and participated therein, then the result would be that they secured these goods unlawfully, because in fraud, and they would be chargeable with their value in this suit."

After referring to the testimony in relation to statements made by one of the garnishees to the representative of Bradstreet's Commercial Agency touching Lustig's financial condition, the court proceeded as follows:

"Now, it is true, that Treusch was under no legal obligation, perhaps, independent of other questions, to give any definite answer, or to give full answer to those inquiries; still if, knowing the purpose for which the commercial

agent came, he intentionally put him off the scent, and misled him by laying a false basis before him upon which to rate the financial standing of Lustig, and that was done for the purpose of enabling Lustig to extend his purchases by credit, that would be fraud upon creditors if it was done with that motive, and make him a party with Lustig in accomplishing the result which the party giving that information might reasonably and naturally understand would be the consequences. If you find that was the case, gentlemen of the jury, it would be a circumstance which you may take into account in considering whether the Treuschs colluded with Lustig to enable him to make purchases which you may find, from the evidence in the case, were, as to the creditors of Lustig, fraudulent. But, whether relatives or not, no creditor can collect his dues from his debtor by or through a fraud upon others, such as would result in the obtaining from them by purchases of their property, without payment or expectation of payment, and the obtaining of those goods in payment of his debts by a creditor having knowledge of the circumstances of their purchase. In other words, if you are satisfied from the facts that have been laid before you that Lustig devised a scheme of purchasing a large quantity of goods from people abroad, and transferring those goods, either in lot or as occasion might offer, to the Treuschs in payment of his debts to them, when he knew or had every reason to believe that he would not be able to pay for the goods that he was purchasing, that was a fraud on his part; and, if the Treuschs had notice of it, they were mixed in it, and became subject to the consequences of it. Nor where the goods have been honestly purchased, on credit or otherwise, can a creditor receive in payment of his debts goods of his debtor, where the debtor makes that disposition of his property with the actual intent and purpose to defraud his other creditors; and, the creditor so receiving the goods, participating in that extent, such creditor acquires by such transfer no title to such goods, (as against the defrauded creditors.)"

There is nothing in these instructions, taken as a whole, on which to base the objection made by counsel for plaintiffs in error that the court below refused to charge the jury that the garnishees must have in some way participated in Lustig's fraud in order to be affected by it, and that mere notice of his intent to defraud his creditors would not affect them if their debt was honest, and they did not aid, abet, or connive at any scheme to defraud Lustig's creditors. On the contrary, the two propositions submitted to the jury on the testimony are: First, that if there was a scheme on the part of Lustig to purchase or obtain goods on credit with no intent to pay therefor, that was a fraud on his part, and, if such goods were turned over to the Treuschs in payment of Lustig's debt to them, and they knew or had notice of Lustig's fraud in acquiring the property, they would be affected by his fraud, and their title would be unlawful or invalid as against the defrauded creditors of Lustig; and, secondly, that if Lustig acquired the goods honestly, on credit or otherwise, and thereafter turned the same over to the Treuschs in payment of his indebtedness to them, with the intent and for the purpose of defrauding his creditors, and the Treusch Brothers, or either of them, had notice of such intent, and participated therein, then their acquisition of such goods would be unlawful as against the creditors defrauded, and they would be liable for the value thereof. In other words, the jury was told, in substance, that if Lustig obtained the goods by fraud or by means of a fraudulent scheme, and the Treuschs had notice of that fact, they could not lawfully accept such goods in payment of their debt against him, and hold the same against such defrauded creditors; but if Lustig had procured the

goods honestly, and without any such fraud, and thereafter turned the same over to Treusch Brothers in payment of his debt to them, with the actual intent and for the purpose of defrauding his creditors, then the Treuschs must not only have notice of such fraudulent intent, but must also have participated therein, in order to render their title invalid as against the creditors defrauded by such disposition. The distinction taken is that the creditor who receives in payment of his debt property which his debtor has acquired fraudulently is affected by notice of such fraud, while the creditor who accepts in payment of his debt property honestly acquired by his debtor, and which such debtor transfers with the intent and for the purpose of defrauding his creditors, must not only have notice of, but must participate in, such fraudulent intent.

Counsel for defendants below requested the court to charge the jury "that these defendants are not responsible for any acts of Jacob Lustig, and are not to be bound by them, and no unfavorable prejudice should be given place in your minds against them on account of any transactions of Lustig, unless the proof shows that they have aided, abetted, or connived at such action; and if the proof does not show that they so aided, abetted, or connived, then no acts of Jacob Lustig are to be considered as establishing any fraud on the part of said defendants;" which the court gave with the insertion after "connived:" "Or had notice that he was acting with intent of defrauding his creditors." The court was further requested by defendants to charge the jury "that you should come to the considerations of the questions involved in this issue with minds entirely unprejudiced, and with the presumption that all of the acts of the defendants were honest; and you must not find a verdict for the plaintiffs until the presumption is overcome by proof which satisfies you that the defendants are participants in a fraud perpetrated by Jacob Lustig on his creditors," which request the court gave to the jury, with the addition of the words: "Or, what was the same thing, as I have said, had notice that Lustig was perpetrating a fraud on his creditors." It will be observed that these requests, referring to Lustig's transactions and acts, did not indicate to which branch of the case they related, and it is fairly to be assumed that the court understood them as applying to the first branch or portion of the charge relating to Lustig's having procured the goods by means of a fraudulent scheme, and the defendant's connection therewith, by aiding, abetting, or conniving at the same, or by having notice thereof, when taking the goods from Lustig. That the court so understood and treated said requests is shown by its further instruction, immediately following:

"So that you will see it comes to this result: that substantially you are to determine whether these transactions were honest or not. If they were, that is, the transactions of buying these goods and turning them over, and the acceptance of them by the Treuschs,—if that was honestly done, then these defendants ought not to be held liable because Lustig was their brother-in-law. He had a right to pay them by honest means, and they had a right to get their pay by honest means. But if you believe this was a dishonest scheme to enable the Treusch Brothers to get payment of their debt from Lustig to themselves, at the expense of the sellers of these goods, then you

ought not to have the slightest hesitation in putting your stamp upon it. If that fact is not made out in this case to your satisfaction, you should with equal readiness render a verdict for the defendants."

These instructions were not only correct under the authority of Klein v. Hoffheimer, 132 U. S. 375, 377, 10 Sup. Ct. Rep. 130, and Jones v. Simpson, 116 U. S. 614, 6 Sup. Ct. Rep. 538, but were more favorable to the plaintiffs in error than the testimony warranted. They assumed in their favor two facts which were not fully or satisfactorily established by the proofs, viz. the existence of a valid indebtedness against Lustig, and their reception of the goods in payment of that indebtedness. The facts and circumstances of the case were of a character to raise grave doubts as to the bona fides of the transactions between plaintiffs in error and Lustig. They were of such suspicious character as to impose upon the plaintiffs in error the duty of establishing the validity of their alleged indebtedness against Lustig by clear and satisfactory evidence, under the rule laid down in Callan v. Statham, 23 How. 477-480; Jones v. Simpson, 116 U. S. 614, 6 Sup. Ct. Rep. 538; and Crawford v. Neal, 144 U. S. 595, 12 Sup. Ct. Rep. 759,—that, where the fraudulent intent on the grantor's part is shown, and the circumstances are suspicious, the purchaser must show that he has paid value; and upon the establishment of that fact the attaching creditor must then make it appear that the purchase was made in bad faith, or with notice of the fraud. In other words, as stated in Jones v. Simpson, 116 U. S. 614, 6 Sup. Ct. Rep. 538: Upon its appearing that the vendor made the sale with the fraudulent intent to hinder or delay his creditors, the burden of proof is upon the vendee, as between him and existing creditors, to show by competent proof that he paid a sufficient consideration for the property. "But such payment being shown, the vendee is entitled to a verdict and judgment, however fraudulent may have been the intent of the vendor, unless it appears affirmatively from all the circumstances that he purchased in bad faith; and such bad faith may exist where the vendee purchases with knowledge of the fraudulent intent of the vendee, or under such circumstances as should put him on inquiry as to the object for which the vendor sells." So in Klein v. Hoffheimer, 132 U. S. 375-379, 10 Sup. Ct. Rep. 130, where the transactions were of a suspicious character, the supreme court held that it was not improper for the trial court to impose upon the garnishees, in a suit like the present, the burden of establishing the fairness of the proceeding by which they obtained possession of the property. Plaintiffs in error were not, as they might have been, subjected to any such requirement. Again, the court's instructions assumed that Lustig had turned over the goods in payment of his debt to the plaintiffs in error, when the proof showed, or tended to show, that money and other goods constituted a part of the consideration on which he had made the disposition of the property. This fact did not entitle plaintiffs in error to an instruction, such as they claim was denied them, that a creditor may lawfully accept property from his debtor in payment of his debt even though he has notice of his debtor's intention to defraud his other creditors in turning

over or transferring such property. There are authorities—such as Covanhovan v. Hart, 21 Pa. St. 500, 501—holding that, where preferences are allowed, and as an incident of the owner's power of disposition and the right to be paid, a creditor may receive property from his debtor in payment without being affected by such debtor's motives or intentions in so disposing of the same. It is not necessary to discuss or pass upon that question in the present case, inasmuch as there were other considerations, besides actual or alleged indebtedness to the purchasers, in money and goods, which formed in part a present consideration, and of such a character as enabled the fraudulent vendor to place the same out of the reach of creditors. This partial present consideration, if actually paid by the plaintiffs in error to the fraudulent vendor with notice of his intended fraud upon his creditors, would have invalidated the transactions, treating them as one continuous proceeding. If void in part, the transaction would be void in toto as to Lustig's creditors. This is well settled by the authorities.

After a careful examination of the court's instructions to the jury, which must be considered as a whole, (Insurance Co. v. Ward, 140 U. S. 76, 11 Sup. Ct. Rep. 720,) we fail to discover any error therein prejudicial to the plaintiffs in error. The charge is supported by the decisions of the supreme court cited above, nor is it in conflict with any rule or principle laid down by the supreme court of Michigan in the cases of Hill v. Bowman, 35 Mich. 191; Jordan v. White, 38 Mich. 255–257; Sweetzer v. Higby, 63 Mich. 22, 29 N. W. Rep. 506; and Steel Works v. Bresnahan, 66 Mich. 489, 501, 33 N. W. Rep. 834,—relied on by counsel for plaintiffs in error.

It is lastly urged that the court below erred in refusing to charge the jury, as requested by defendants' counsel:

"That, in order to render a verdict against the defendants, you must find not only that Lustig purchased goods in a general way with an intent not to pay for them, but that he purchased the identical goods that were turned over to Treusch Brothers with that intent; and, further, that he, as a matter of fact, had not paid for them, because any goods that he had actually paid for, which were turned over to Treusch Brothers on account, would belong to Treusch Brothers, and no recovery for such goods could be had in this action; and, unless you can find by the proof that the identical goods that were turned over to Treusch Brothers on his indebtedness had never been paid for by Lustig, your verdict must be for the defendants."

This request was properly refused. There was no testimony on which to predicate such an instruction. The transactions on Lustig's part were claimed to be fraudulent, not merely against some of his creditors or vendors, but against all who sold him goods on credit; and there was testimony tending to show that all his purchases during 1891 were made on credit, and were never paid for, and never intended to be. The proceeding was not one in which the persons selling the goods to Lustig were seeking to disaffirm the sales for fraud, and to recover the identical goods or the value thereof. On the contrary, it recognizes Lustig's title to the goods so fraudulently purchased by him, and treated him as the principal debtor therefor; and the request wholly ignored the second branch or theory of the case on which the court had instructed the jury,

that, if Lustig had acquired the goods honestly, so as to vest him with a good and unimpeachable title thereto, and thereafter turned such goods over to Treusch Brothers with the purpose and intent of defrauding his creditors, and they (Treusch Brothers) had notice of and participated in such fraudulent intent and purpose, they would be affected by his fraud, and would hold such goods unlawfully as against the defrauded creditors, etc. The instruction requested did not, therefore, cover the whole case. Nor did its assumption of facts constitute a complete defense to the action, and, if given, would have been erroneous.

Upon the whole case our conclusion is that there is no reversible error, and that the writ of error should be dismissed, with costs, and it is accordingly so ordered.

TAFT, Circuit Judge, (dissenting.) Were this a proceeding in equity under the statute of 13 Eliz. to set aside the sale from Jacob Lustig to the Treusch Brothers as in fraud of creditors, which had resulted in a decree for the complainants below, I should have no hesitation in sustaining the decree as fully supported by the evidence in this record. But the statute of Michigan has changed the form of action to enforce rights secured by the statute of 13 Eliz. to defraud creditors from the chancery to the law side of the court, by permitting the creditor to garnishee the fraudulent grantee of the debtor, and recover from him the goods, or their value, in a suit at law before a jury. Under this procedure the alleged fraudulent grantee is entitled to have the facts passed upon by the jury after the court in its charge shall have correctly laid down the principles of law upon which their investigation of the facts must proceed. If the principles of law in their application to the facts of the case are not correctly expounded to the jury, then it is the right of either party to have a new trial, no matter what result an appellate court might reach if, sitting as an appellate court of equity, it could determine the issue on its merits. In this case the defendants in error sold to Jacob Lustig, a cigar and tobacco dealer in Grand Rapids, more than $7,000 worth of goods and merchandise, which he never paid for. Lustig about the same time had purchased on credit a large amount of goods from other tobacco houses, with the evident intention of never paying for any of them. Of the goods furnished by other creditors than the plaintiff below he transferred some $10,000 worth to his brothers-in-law, Morris and Emanuel Treusch, the defendants below and the plaintiffs in error. It is in evidence that none of the goods sold to Lustig by the plaintiffs below were transferred to the Treusch Brothers. The action by the defendants in error, therefore, was as general creditors to recover by garnishee process the value of the goods which they had never owned to the amount of their claim against Lustig. The only ground for their action was that Lustig, being the owner of these goods and in failing circumstances, transferred them, in fraud of their rights as general creditors, to the Treusch Brothers. The fraud which Lustig had been guilty of in procuring the goods transferred to the Treusch Brothers from other creditors than the plaintiffs, gave the plaintiffs no right to complain.

The plaintiffs' right to recover goods or their value from Treusch was wholly dependent on Lustig's title to them and ownership in them. It was not material, as an ultimate fact in this controversy, that the Treusch Brothers conspired with Lustig to defraud the persons from whom the goods held by Treusch were purchased. The persons thus defrauded could, of course, recover in trover the value of the goods from the Treusch Brothers, as transferees with knowledge of the fraud in Lustig's title; but the plaintiffs, from whom the goods were not purchased, had no such right. Their rights grew out of the fraud, if any, in the transfer by Lustig to the Treusch Brothers of goods which, so far as third persons were concerned, belonged to him, in fraud of general creditors. In order to show that the transfer of these goods from Lustig to Treusch was in fraud of general creditors, it might be relevant to introduce evidence of a general scheme of fraud in the purchase of the goods, in which the Treuschs and Lustig were acting together, as tending to show a guilty relation between Lustig and Treusch which would overcome a claim that Treusch was an honest creditor honestly receiving pay for his debts. But the ultimate fact which must have been established in order that the plaintiffs below could have the right to set aside the transfer from Lustig to Treusch was fraud in that transfer, not as against the original owners of the goods, but as against the general creditors of Lustig, solely on the hypothesis that Lustig was the owner of the goods transferred. Any other view seems to me to confuse the right of a general creditor, which is that the debtor shall not hinder or delay the collection of his debt by fraudulently disposing of his assets available for its payment, and the right of the vendor who has been defrauded into selling his goods to set aside the sale and recover the goods.

With this statement of the principles which should govern in a consideration of the facts of this case, let us see what the charge of the court was. The bill of exceptions states a part of the charge as follows:

"After instructing the jury, in substance, that the evidence in the case did not support the claim of plaintiffs that goods of Lustig other than those accounted for on the books of Lustig and Treusch went into the Treuschs' hand, and that there was no evidence in the case showing that the defendants ought to be held for any deficit, if any, in Lustig's stock, and that the jury should leave that basis of plaintiffs' claim out of the case, the court charged the jury: 'The question of fact involved, then, upon this main branch of the case is divided into two specific branches: First, in regard to the intent of Lustig in making these purchases of the goods that were turned over to the Treuschs; and, second, as to whether the Treusch Brothers connived at Lustig's purposes, or had notice of the fraud on his part in buying and turning over to them those goods; because, gentlemen, the law is that, however so fraudulent the conduct of a debtor may be in acquiring the title to goods, and however fraudulent his own motive may be, in turning them over to a creditor, unless that creditor has also notice of the fraudulent purpose, or aids and abets it in some way,—in other words, if he is entirely innocent of all fraud himself, or knowledge of the intended fraud on the part of the debtor,—he is not responsible for it. He stands on his own merits, and is not to be condemned by the faults of his debtor, unknown to him. If Lustig bought a large stock of goods on credit without intending to pay for them, or without having any expectation of being able to pay for them, and for the purpose of turning

those goods over, so far as necessary, to Treusch Brothers, in payment of his debts to them, and they were so turned over, and Treusch Brothers, or either of them, had notice that the goods thus received were so purchased by Lustig with the intent and purpose stated, then you should find that those goods came into the hands of the defendants unlawfully, for it would be a fraud upon creditors, and they would be chargeable with their value in this suit.' "

In my view, the statement by the court to the jury that there was no evidence to impeach the validity and bona fides of Lustig's debt to the Treusch Brothers was not warranted by the evidence, and was prejudicial to the plaintiffs below; but, as the plaintiffs below recovered a verdict, it requires no further comment. My object in making the above quotation from the charge is to show that the court, in effect, charged the jury that, if Lustig obtained the goods which were the subject of this suit by fraud on his vendors, in which fraud the Treuschs connived, then the plaintiffs below were entitled to recover in the action. Now, it is conceded that there was no evidence whatever to show that the goods sought here to be recovered were ever owned by the plaintiffs below. Therefore the court's charge to the jury was that A., a creditor of C., might recover from B. goods transferred to B. by C. in payment of an honest debt owing by C. to B., because B. and C. had conspired together to defraud D., the fraud consisting in the intention on the part of C., known to B., not to pay D. the price of the goods. This, I submit, is a confusion of elementary principles. D., of course, would have the right in an action of trover, without regard to the statute of 13 Eliz., or the Michigan statute, under which this action was brought, to recover the goods fraudulently obtained, either from C. or B. But A. had no interest, and was not prejudiced by the fraud practiced on D. by B. and C. The only complaint which A. could make of the transfer of goods by C., which A. had never owned or had any interest in, must have been entirely predicated on C.'s title to the goods and on A.'s right as a general creditor to have his debt paid by levy or other process on goods owned by C. The charge which I have quoted was duly excepted to. As it was, to my mind, erroneous, and presented the theory to the jury upon which the verdict doubtless rested, the judgment should, in my opinion, be reversed, and a new trial ordered.