GERARD B. TOWNSEND and MILTON S. GUITERMAN, as
  Trustees, etc., under the Last Will and Testament
  of BENJAMIN F. EINSTEIN, Deceased, Plaintiffs, *v.*
  JESSE WINBURN, BENJAMIN URY, BENJAMIN RIPIN,
  NEW YORK CITY CAR ADVERTISING COMPANY and
  RAILWAY ADVERTISING COMPANY, Defendants.

(Supreme Court, New York Special Term, June, 1919.)

Wills — trusts — when legal title to corporate stock is vested in
    executors or trustees they can only vote it as joint owners —
    executors and administrators — pleading — corporations — when
    motion to dismiss complaint denied.

> As a general rule an executor will be deemed a trustee when
> the duties imposed are active, and where executors are given the
> management of the trust they may act in both capacities at the
> same time.

> Where by his will the legal title to corporate stock owned by
> testator at his death is vested in his three executors as trustees,
> they can only vote it as joint owners, and if they disagree as to
> the manner in which the shares shall be voted, they cannot vote
> at all.

> The will of plaintiffs' testator, who at the time of his death
> was the minority stockholder in two business corporations,
> created a trust in respect to the stock, by which the trustees
> were invested with a full discretionary power of sale, with
> direction that the executors should vote the stock at any corpo-
> rate meeting and should dispose of it or enter into any agree-
> ment in relation thereto " by their joint action and not other-
> wise." The will also expressed the testator's desire that there
> should always be two trustees and prescribed the method to be
> followed in filling a vacancy. The dividends of the business
> had been divided between the testator and defendant, who was
> the majority stockholder in both companies, neither receiving a
> salary as an officer; but soon after the death of testator, by the
> vote of the defendant and that of one of the testamentary
> trustees, there was for several years under a resolution of the
> board of directors a salary voted to defendant as pesident. In
> an action brought by the testamentary trustees to compel the

return to the companies of the salaries so paid to defendant and to restrain further receipt of such salaries, it appeared that after the death of plaintiffs' testator dividends were declared or refused at the whim of defendant and the uncontradicted evidence disclosed that his purpose was and is, if not to freeze out the minority, to deprive it of all benefits that might accrue from the division of dividends and so make its holdings of little or no value, and a motion to dismiss the complaint will be denied.

MOTIONS to dismiss complaint.

Cohen, Gutman & Richter (Julius Henry Cohen, of counsel), for plaintiffs.

Benedict & Stricker (Abraham Benedict, of counsel), for defendants Winburn and New York City Car Advertising Company.

Scott, Gerard & Bowers (Francis M. Scott, of counsel), for defendants Railway Advertising Company and Benjamin Ripin.

ERLANGER, J. This action was brought to compel the defendant Jesse Winburn to return to the two defendant companies of which he is president certain salaries paid to him under resolutions of the board of directors, and to restrain his further receipt of such salaries. The business of both corporations relates to the renting of advertising space in the surface railway lines in this city and contracting with advertisers for the use of such space. During his lifetime Mr. Einstein owned twenty per cent of the stock of each company, and since 1913 Mr. Winburn owned eighty per cent in both. The former, before he died, occupied himself in procuring contracts from the railways and the latter devoted his attention to obtaining contracts from advertisers and managing the details of the business. Mr. Einstein

died in February, 1915, and since then all the work devolved upon Mr. Winburn. For some time prior to Mr. Einstein's death, neither he, as president, nor Mr. Winburn, as vice-president and treasurer, received any salary. They, it seems, contented themselves with the dividends which were divided between them in proportion to their stock holdings. Mr. Einstein left a will by which he appointed the plaintiffs his executors and trustees, and in respect of the stock held by him in the two advertising companies he created a trust for the benefit of his children, investing the trustees with full power, in their discretion, to sell the same or part thereof. Among other things he directed: "My said executors shall vote the said shares of stock at any corporation meeting and shall otherwise dispose thereof or enter into any agreement in relation thereto *by their joint action and not otherwise.*" He expressed a desire that there should always be two trustees of the trusts created by him, and he provided the method to be followed in case a vacancy occurred. Subsequent to Mr. Einstein's death, Mr. Winburn was elected president and treasurer of the companies and Mr. Townsend vice-president and secretary. They were also, together with one Ripin, elected directors. About two weeks after Mr. Einstein died, Mr. Winburn stated that he was going to draw a salary, and the plaintiffs, as trustees, were not averse to the claim in view of the fact that the burden of the labor had shifted to him; but Mr. Townsend believed, and so informed Mr. Winburn, that the particular time was not propitious as the business prospects did not look good. A request for $25,000 a year was made and finally $15,000 was accepted as satisfactory, and on April 19, 1915, a meeting of the stockholders of both companies was held at which both trustees and Mr. Winburn were present, and resolutions were passed

voting to the latter, as president, the last named sum as his salary for that year to date from April 1, 1915. After this Mr. Winburn's demands, according to the evidence of Mr. Townsend, became more and more insistent. The power of control as the majority holder of the stock was all in his hands. He could change the directories at will. He was the dominant factor and would not be balked in any wish he expressed. His every request was in the nature of a demand and when he spoke his voice was potential. For the children of the deceased Mr. Einstein he had little sentiment or feeling. He declared to Mr. Townsend that he felt himself under no obligation to them and that there was no reason why they should get anything from *his business.* Influenced by a desire to absorb the profits of the companies for himself, he demanded that his salary for the year 1916 be increased to $25,000 and he asked Mr. Townsend to write up the minutes to that effect, which was done. For the year 1917 he demanded $50,000 and finally accepted $35,000, the minutes to that effect being written up by Mr. Townsend. Resolutions were adopted in respect of the two increases mentioned by the votes of Messrs. Winburn and Townsend and the minutes which recorded them were styled as minutes of directors' meetings. It is urged that Mr. Townsend, before writing them up, did not discuss with Mr. Winburn whether the meetings were to be directors' or stockholders', but that he, alone, determined in what set they should be written and in doing so designated them as minutes of the directors. The inference is drawn that he did this deliberately in order to allow the children of Mr. Einstein, at some future time, to attack them. This charge does not impress me in view of his uncontradicted evidence and his attitude at all times. The minute books were kept at the offices of the companies

and Mr. Winburn's knowledge of their contents may well be presumed. No proof was offered that he ever objected or that he ever claimed that the meetings were other than what the records show. It was he who directed that the minutes be prepared embodying the salary increases and by his silence between December, 1915, and the time when this action was brought, some time in April, 1918, the complaint being verified April first of that year, he may properly be held to have fully acquiesced in the form of the record made. All these meetings were held at the office of Mr. Townsend. They were informal and occurred whenever Mr. Winburn called there. Ripin, the third director, was not present at either of these two directors' meetings, nor was he notified to attend. On January 8, 1918, a meeting of the stockholders of the New York City Car Advertising Company was held at the office of the company. Both Mr. Winburn and Mr. Townsend were present. The by-laws were amended by adding at the end of article 3, section 1, the following: "Any officer may be removed and his successor elected by the Board of Directors, at any time." And article 2, section 1, was amended by adding: "The stockholders may remove any director and fill the vacancy so caused." At the same time and on motion and by stock vote, the board of directors were authorized, by a majority vote, to fix the salary of the president at any amount in their discretion, and that such action shall be valid even though made effective by the vote of the director who occupies the office of president. On this motion Mr. Winburn's stock was voted in the affirmative and the stock of Mr. Einstein's estate was voted in the negative. It may readily be inferred that the motion was made by Mr. Winburn who voted his eighty per cent of the stock in favor of increasing his salary as indicated. These minutes were signed by Mr. Townsend

as secretary.  On the same day the directors of the
same company met, Mr. Ripin being present with the
other two directors.  Mr. Townsend who, by the
amendments to the by-laws just referred to, evidently
appreciated their spirit and intention, then and there
resigned as vice-president, and a Mr. Mehler was
elected in his place.  On motion and by the votes of
Messrs. Winburn and Ripin, the salary of the presi-
dent was fixed at $15,000, this salary being in addition
to the salary of $35,000 paid by the other company.
Mr. Townsend voted against the resolution and signed
the minutes as secretary.  On January 22, 1918, the
new board of directors of this company, consisting of
Messrs. Winburn, his friend Ripin and his brother-in-
law Ury, met and Mr. Ripin moved that the board
proceed, pursuant to a vote of the stockholders at a
*special* meeting held on January 8, 1918, to fix the
salary of the president.  The minutes show that Mr.
Winburn surrendered the chair to Mr. Ripin and left
the room and that he did not further participate in the
meeting nor return thereto.  Mr. Ripin then moved
that the salary of the president be fixed at $15,000 per
annum, payable in equal monthly installments.  This
motion was seconded by Mr. Ury " and was unani-
mously carried by the votes of Mr. Ripin and Mr. Ury."
These two directors were mere dummies; neither
is a stockholder, nor has either the slightest interest in
the business.  The scheme to get rid of Mr. Townsend,
who stood in the way of Mr. Winburn, was carried
out; he was dropped from both boards, the field being
left to the latter to do much as he pleased.  After this
litigation was started on behalf of Mr. Einstein's
children and the salary resolutions attacked, Mr. Win-
burn's board met in October, 1918, and, by resolution,
rescinded and annulled the resolution of January 22,
1918, voting the $15,000 salary to him, thus limiting

the issue tried by me to the two increases in salary made in the years 1916 and 1917. I understand that the salary of $15,000 voted by all the stockholders in April, 1915, is not questioned, but only the amounts in excess of that sum, paid since that time. While it appears that Mr. Townsend, during all the time he was a director, voted for the increases in salary, he testified that he, at all times, objected but nevertheless intended to legalize the action of the board by effectuating the will of Mr. Winburn. His position was an embarrassing one. His firm represented the companies and Mr. Winburn at the same time. He was a trustee of the companies and of the Einstein estate. The minority interest he represented was trifling compared to that of the majority owner, but it was his duty to protect it. To continue on the board he must needs have felt himself obliged to carry out the orders of the larger stockholder, and when finally he refused to be longer subservient to the will of Mr. Winburn, he was dropped from the directory. From 1915 on, dividends were declared or refused at the whim of Mr. Winburn. Those declared were small in amounts, except that at one time $10,000 was divided under special circumstances, but even that was not accomplished without begging for it. It is conceded by counsel for the Railway Advertising Company and Ripin that under ordinary circumstances a resolution of the board of directors fixing or increasing the salary of an officer, who is also a director, is voidable if he voted for it and his vote was necessary to adopt it. It is undisputed that the joint vote of Messrs. Townsend and Winburn passed the resolutions in question. Counsel for Messrs. Winburn, Ury and the City Car Advertising Company goes further and he contends that, as Mr. Ripin was a director at all the times referred to, the failure to serve notice of the meetings upon him

Supreme Court, June, 1919.          [Vol. 107.

so that he might attend rendered all the meetings. absolutely void. There is abundant authority in support of his contention in that regard. It was testified to by Mr. Townsend that no notice was ever served on Mr. Ripin. Section 3 of article 2 of the by-laws of the Railway Advertising Company provides that " the Board of Directors shall hold meetings at such times as they see fit or the president shall require. They may by resolution prescribe when and where their regular meetings shall be held, how special meetings shall be called and what notice of their meetings shall be given." Section 3 of article 2 of the by-laws of the New York City Car Advertising Company provides that " the Board shall determine the time for holding its regular meetings. Special meetings may be held upon the call of the president or the secretary by giving at least one day's notice of the time and place of holding the same personally or by letter or telegram. Meetings of the Directors shall be held at such places as the board shall from time to time determine." There is nothing before me to show that the board of either company ever passed a resolution as required by the sections quoted. But it is clear that notice of special and general meetings was required to be given. The defendants, it seems to me, are at both ends of the dilemma. If the meetings of the directors as such were illegal, a decree in plaintiff's favor compelling restoration logically follows, and if the proceedings are voidable at the suit of the proper parties, the same result ensues. But the defendants, to avoid the effect of the concession mentioned, maintain that when a court is called upon to choose between two classifications, lawful stockholders' meetings which acted within their powers, and unlawful directors' meetings, or meetings held by them at which they exceeded their power, the choice

should be in favor of holding the meetings to be those of stockholders. This argument rests upon the theory that when the directors met, *all* the stockholders were present and their acts as such were valid even though adopted by the vote of the one to be benefited thereby. Furthermore, it is claimed that it makes no difference how the meetings are labelled; that in a close corporation consisting of a few persons which is tantamount to a copartnership, the utmost informality is permissible so long as the rights of the third persons and creditors are not involved; that the results agreed to in conversations will be as valid and effectual as if reduced to formal resolutions and written into minute books. There is authority in support of that position. From this it is maintained that the salary increases were in fact and in law adopted by all the stockholders and cannot be attacked. To establish how far stockholders may go the case of *Gamble* v. *Queens County Water Co.,* 123 N. Y. 91, among others, is confidently relied on. In that case it was held that a shareholder has a legal right at a meeting of the shareholders, to vote upon a measure, even though he has a personal interest therein separate from other shareholders. In such a meeting each shareholder represents himself and his own interests solely, and he in no sense acts as a trustee or representative of others. But the court particularly pointed out " that where the action of the majority is plainly a fraud upon, or, in other words, is really oppressive to the minority shareholders, and the directors or trustees have acted with and formed part of the majority, an action may be sustained by one of the minority shareholders suing in his own behalf." It thus appears under the ruling in the cited case that even stockholders who are also directors may not act to the injury of the minority. The effort to make the meetings both directors' and

Supreme Court, June, 1919.        [Vol. 107.

stockholders' is plausible but not convincing. If the meetings of the directors were illegal because of the failure to give notice to Mr. Ripin, the sessions as stockholders must be condemned for lack of notice to Mr. Guiterman. The by-laws of both companies specify not only that notice shall be given by mail, but the time within which it is to be given. What Mr. Townsend may have said to his associate after the meetings or before did not have the effect of either a waiver of notice or attendance as contemplated by the by-laws. The assertion of defendants that the absence of the required notice is immaterial because all those interested did in fact attend and participate, but begs the question. All the stock was not represented, Mr. Winburn's 80 per cent alone could have taken part. True it was the majority but that did not make the meetings valid. In support of this position it is maintained that there was no proof when the trust in respect of the stock was set up, and if the trustees had not acquired it in that capacity but still held it as executors, either was qualified to deal with it, and as Mr. Townsend had assumed to represent it and vote upon it, he acted for both himself and associate and with the latter's acquiescence. It makes not the slightest difference whether the trust was especially set up or not, though, in my opinion, it became effective from the death of Mr. Einstein. When persons are named as executors and are given the management of a trust they may act in both capacities at the same time and, as a general rule, an executor will be deemed to be a trustee when the duties imposed are active in character. *Matter of McDowell,* 178 App. Div. 243. Suppose the trust which is a special one had not in fact been set up at the time referred to, that would not aid the defendants. Neither of the executors could singly vote the stock. Neither could brush

aside the express direction of the testator. We are not dealing with the conduct of a single executor and an innocent third person, but with a voting power in respect of which Mr. Winburn was fully advised. " My said Executors shall vote the said shares of stock at any corporation meeting * * * *by their joint action and not otherwise.*" The word *shall* does not mean *may.* No discretion is vested in either of them in connection with the vote. The direction is mandatory. It does not mean that both were bound personally to attend at meetings, and even if both did attend it would not be the first instance on record where such a thing occurred. It is common knowledge that such attendance frequently happens in some of our large corporations. The fact, however, is that they could either vote the stock together personally or by proxy; but whether they voted it one way or the other, the testator made it impossible for either singly to combine with the other stockholders to the injury of the beneficial owners. Upon the death of a stockholder his administrators become vested with the legal title to the stock and they are entitled to vote it without a formal transfer on the books. *Matter of North Shore Staten Island Ferry Co.,* 63 Barb. 556. But when the legal title is vested under a will in three executors they can only vote as joint owners, and if they cannot agree as to the manner in which the shares shall be voted, they cannot vote at all. 10 Cyc. 334; Cook Corp. (ed. 1913), § 612, p. 1796. The rule applicable to trustees is not the same as in the case of executors, they are not usually concerned with the administration of the estate of the deceased, they must act jointly in dealing with the trust estate. " In the case of a private trust, as distinguished from a public or charitable trust, where there are several trustees and all have accepted and are exercising the office,

their powers, interest and authority are equal and undivided; they cannot act separately, but must act as a unit, except where authority to act is given to a majority of the trustees by statute, or by the instrument creating the trust, or possibly except in the case of an urgent emergency." 39 Cyc. 307. Surely voting salary to an officer is not such an emergency as the law contemplates. And so it has been held that when trustees cannot agree, a court has no power to interfere and direct the voting. *Wanneker* v. *Hitchcock,* 38 Fed. Repr. 383, 385. All this is conceded by the defendants, but upon the facts as they assume them the well established rule, they claim, does not apply to them. There is not the slightest evidence in the case that Mr. Guiterman ever agreed to the increases, nor do I think the inferences drawn as to him are justified by anything in the record. The attendance of Mr. Townsend at the meetings was merely as director and it did not carry with it the rights of the absent executor and trustee and as the right to vote the stock inhered in both jointly and not otherwise it is idle, it seems to me, to insist that the stock of the estate was represented at the meetings at all. Resting upon the position taken by them with regard to the dual character of the meetings, the further claim that the stockholders at the times ratified their own acts as directors, is equally untenable. This contention also assumes that Mr. Townsend owned and represented the Einstein stock with Mr. Guiterman's passive acquiescence. If the correctness of the point so made is assumed merely for its sake, the views of the Court of Appeals are directly opposed to the ratification theory. In *Godley* v. *Crandall & Godley Co.,* 212 N. Y. 121, the court had before it the like question. In that case salaries were voted to directors and later the stockholders, consisting of those who had received the preferential pay-

ments, voted to ratify the acts of the former. Mr. Justice Miller, for the court, said: "It is undoubtedly the general rule that acts done in the interest of the corporation, which are voidable only, *i. e.*, not fraudulent or *ultra vires,* may be ratified by a majority of the shareholders, and that those who object must correct them within the corporation * * *. Whether increases of salaries voted by directors to themselves come within the rule may well be doubted." Further on the court said: " But even majority stockholders may not for selfish purposes act in hostility to the interests of the corporation with the intention of defrauding the non-assenting stockholders." I hold that Mr. Townsend's presence at the meetings as a director could not as a stockholder bind his coexecutor and trustee, nor the estate he represented. The Einstein stock could only be voted as I have indicated, and there was no assent by the minority at all. Again it is asserted, that through the acts of Mr. Townsend, both trustees are estopped and cannot now question the validity of the resolutions. What was said in the *Godley* case is, by this contention, wholly ignored. The question of estoppel does not appear to have been raised in the cited case, but the facts and the argument there made are quite similar to those here. The estoppel is rested upon the ground that Mr. Winburn accepted the $35,000 voted to him on the promise of Mr. Townsend that the trustees would take no action in court to prevent the payment of the salary so voted. That Mr. Winburn relied upon this statement and accepted the money. I cannot see the slightest basis for such a claim. It is unique but finds no support in law. At the very moment the salary was voted his dissatisfaction was announced followed by his declaration that he would later bring up the question of an increase to $50,000 and would then insist on getting

it, and he did get it in the manner shown; and upon being advised of the danger to him in taking it, he convened his friendly directors and had the vote favorable to him annulled. Mr. Townsend could not bind his co-trustee by such a promise, and even though the latter did not protest, a court of equity will not, I think, hold him to have acquiesced by his mere silence. The doctrine of estoppel is frequently applied between corporations and innocent third persons, but not to a situation similar to the one disclosed by the record. Not to a case where the dominant director and shareholder directs a thing to be done, and the co-director obeys in like manner as a private obeys the order of one superior in rank. And lastly, it is contended that courts are not open to a shareholder who expressly agrees to an illegal act being performed, and then later seeks to have it set aside. In this it is again assumed that Mr. Townsend singly could deal with the stock and bind his co-trustee and the estate, and no regard is paid to what the court said in the *Godley Case, supra.* The point last contended for is met, however, by another which is not to be overlooked. In *Wetmore* v. *Cooper,* 92 N. Y. 76–85, Chief Judge Ruger said: "We see no reason why a trustee who has been guilty even of an intentional fault is not entitled to his *locus penitentiæ* and an opportunity to repair the wrong which he may have committed." This is a just rule and I see no escape of the defendants from its effect. In the last analysis, stockholders who are also directors are not omnipotent and may not appropriate to their own private ends, by way of salaries, the earnings of a company. The authorities in support of this principle are so numerous that it is only necessary to refer to the last word of our Court of Appeals on the subject. *Kavanaugh* v. *Kavanaugh Knitting Co.,* 226 N. Y. 185,

was concerned with the question of the power of both directors and stockholders. In that case a minority stockholder brought suit to restrain the directors and majority stockholders from carrying out their resolution to dissolve the corporation. The directors sought to do this because the minority stockholder had brought an action to restrain the payment of excessive salaries voted by the holders of a majority of the stock to themselves. The business of the corporation was exceedingly prosperous and after amending the by-laws so as to get rid of the plaintiff who resigned under threat of removal, the stockholders met in annual meeting in January, 1918, and adopted a resolution whereby the compensation of the president and treasurer was fixed at twenty per cent of the corporate net earnings for the year, thus continuing the compensation voted to them in the previous year. Plaintiff demanded that the resolution be rescinded and it was changed so that the compensation voted would begin from June 1, 1917, instead of from January 1, 1917. The court, at the suit of a minority stockholder, held the compensation so voted to be unfair and unreasonable and enormously greater than is paid for similar services by similar or greater corporations. Among other things, Judge Collin said: "When a number of stockholders constitute themselves, or are by the law constituted, the managers of corporate affairs or interests they stand in much the same attitude towards the other or minority stockholders that the directors sustain, generally, towards all the stockholders and the law requires of them the utmost good faith." The salaries voted to Mr. Winburn seem to me in the light of the evidence offered to be unreasonable. It was not shown that a greater amount of skill is required in the advertising business than is called for in companies of greater magnitude, and when it is considered that the minority holdings are slight com-

pared to his, the salary voted him plus the dividends which he might consent to declare gives to him practically everything. The uncontradicted evidence, the very atmosphere created by the demands of Mr. Winburn, indicate that his purpose was and is to freeze out the minority, and if not that to deprive it of all benefits that might accrue from the division of dividends and thus make their holdings of little or no value. The motions to dismiss the complaint are denied.

*Motions denied.*