**KIND et al. v. CLARK, Attorney General.**
No. 206, Docket 20452.

Circuit Court of Appeals, Second Circuit.
April 9, 1947.

O'Connor & Farber, of New York City (Arnold T. Koch, of New York City, of counsel), for plaintiffs-appellees.

John F. Sonnett, of Washington, D. C., John F. X. McGohey, of New York City, Harry LeRoy Jones, George B. Searls, and George W. Jansen, all of Washington, D. C., Leon Yudkin, of Brooklyn, N. Y., and William J. Conner, of Washington, D. C., for defendant-appellant.

Before SWAN, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

By a vesting order dated January 7, 1943, the Alien Property Custodian seized and transferred into his name all the shares of stock of Graef & Schmidt, Inc., a New York corporation, then standing in the names of appellees, the trustees of the estate of Hermann Kind, deceased. The Attorney General, the appellant, as successor to the Alien Property Custodian, by a vesting order dated September 14, 1945, seized all obligations owing to the estate from Henckels, K. G., and Graef & Schmidt, Inc., including $63,000 paid as dividends and liquidating dividends on the Graef & Schmidt stock from April 1, 1940 to November 5, 1941, and also all collateral for such obligations.

Appellees brought this action for (1) the return of the stock, or, in the alternative, (2) the adjudication of a security interest in the stock to the extent of $89,074.11 (with interest) and the payment of that sum from appellant. Appellant counterclaimed for the $63,000. After a trial, the district judge entered a judgment directing the revesting of title to the stock in appellees and dismissing the counterclaim.

### The Evidence

Appellees are respectively the wife and son of Hermann Kind, deceased. The original trustees of the estate, under the will of the deceased, were the wife, one Iwersen, and one Loeffler. Loeffler died early in 1939. In 1937, Hermann Kind, son of the deceased, became one of the trustees, succeeding Loeffler. The deceased was born in Germany and came to the United States in 1888, where he lived until his death in 1928. He became a citizen of this country in 1906. His wife was born in the United States, her father having come from Germany at the age of 16. The son, Hermann Kind, was born in, and is a citizen of, the United States.

J. G. Henckels, K. G., of Solingen, Germany, has been engaged in the distribution of fine cutlery since 1731. Beginning with 1883, it maintained in New York City a distributing agency, organized as a separate entity, incorporated in the early 1900's as J. A. Henckels Inc. The deceased owned one-half the stock of that company, and the German concern, the other half. The German concern's one-half interest was seized by the Alien Property Custodian during World War I. Hermann Kind (the deceased) acquired this one-half in 1920.[1] Subsequently he resold this one-half interest to Henckels, K. G.; so that when he died, in 1928, he and Henckels, K. G. each owned one-half the stock. After his death, his estate, in 1928, sold its one-half interest to Henckels, K. G., and ceased, until 1940, to have any interest in the New York company, or its successors, except as a creditor. The 1928 sale was for $171,421.07, of which $36,421.07 was in cash, the balance to be paid, with interest, over a five-year period. The cash payment, together with other funds, the estate loaned to the New York company. Part of the balance of the purchase price was later paid the estate by Henckels, K. G. As a result of these transactions, in 1930, J. G. Henckels, K. G., owed the estate $55,000, and the New York company owed the estate $99,000. In 1930, Henckels, K. G., guaranteed the payment of this $99,000 within four years. By agreements made in 1931 and 1934, the time of payment of both these obligations was extended. By the 1934 agreement, all the stock of the New York company and all the stock of a Canadian company, J. A. Henckels, Ltd., were pledged to secure those obligations.

Iwersen, after 1928, was actively in charge of the American companies. In 1935, the parties, by several written agreements, made the following arrangements: (a) The debt of $99,000 was paid to the estate by the transfer of the merchandise of the New York company to the estate. (b) The estate in turn sold this merchandise to Iwersen who became obligated to pay it $99,000. (c) He in turn sold this merchandise to a New York company, Graef & Schmidt, Inc., for all its capital stock, which was issued in one certificate in his name and placed in his personal safe deposit box. (d) Henckels, K. G., guaranteed

---

[1] Appellant offered to prove that, before the deceased made this purchase (through an intermediary), he had stated under oath to the Alien Property Custodian that he agreed not to sell it to any firm or corporation not a citizen of the United States.

Iwersen's $99,000 obligation to the estate. All the stock of Graef & Schmidt, Inc., and the stock of the Canadian corporation was pledged to secure (1) this $99,000 obligation and also (2) the $55,000 debt of Henckels, K. G., to the estate. In connection with these arrangements, Graef & Schmidt, Inc., was also obligated in some manner to pay the $99,000; while the record is not altogether clear, it would seem that Graef & Schmidt, Inc., was obliged to pay this sum out of its profits, and in subordination to the claims of its other creditors.[2]

Through payments made to the estate by Graef & Schmidt, Inc., in 1937 the $99,000 debt had been reduced to $75,000; no further payments were thereafter made thereon. No payments were thereafter made on the $55,000 debt. Although both these claims were in default, the estate made no effort to foreclose the pledge, nor did it demand payment until October 24, 1939. Accordingly, when the European war broke out in September, 1939, there was owing, and over-due, to the estate, the sum of $130,000 (secured by the stock of Graef & Schmidt, Inc., and of the Canadian company) consisting of these items: (a) $75,000 owing by Iwersen, guaranteed by Henckels, K. G.,[3] and (b) $55,000 owing directly by Henckels, K. G.

In 1937, Iwersen, an American citizen, went to Germany to become a permanent resident. There he served as general manager of Henckels, K. G. The other trustees knew from correspondence in September 1939 that he intended to apply for German naturalization. They did not know that he had done so until 1944, at which time his powers as trustee were terminated. Although, after 1937 he was seldom in this country, he continued to be president of Graef & Schmidt, Inc. until 1940, actively supervising its affairs through voluminous correspondence.

In September 1939, upon Canada's entry into the war, an abortive attempt was made to transfer the stock of the Canadian company to the estate in order to avoid its seizure by the Canadian government. Under Iwersen's supervision, by numerous detailed letters from Germany, Graef & Schmidt was then being conducted by its vice-president, Voss, with the assistance of its treasurer, Bonner. As will presently appear, all correspondence between Iwersen, Voss and Bonner[4] was promptly read by Hermann Kind, one of the trustees of the estate.

On September 14, 1939, Iwersen cabled Voss suggesting that the estate take over the Graef & Schmidt stock. On September 26, Iwersen wrote Voss, in a letter No. 253, in which, after referring to this cable, he said: "I take this opportunity to tell you most expressly that I have, of course, consulted the Foreign Exchange Control beforehand concerning all of my steps, to which they gave their approval, after I gave the assurance that the Estate of Hermann Kind would only make use of the seizure in so far as it was necessary to satisfy its claims against the firm and against me. In other words: I assured them that my co-trustees merit full confidence and that at the end of the war, the Estate of Hermann Kind would gladly give a fair settlement of accounts. Please have this letter with all details read by Hermann so that he will know of my remarks." Voss received this letter on or before October 13. Since Hermann Kind was promptly reading all this correspondence, he must be assumed to have read that letter about that time.

On October 11, Iwersen wrote Voss giving him instructions as to the means of obtaining and transferring to the estate the Graef & Schmidt shares which were in Iwersen's safe-deposit box in New York. This letter was received by Voss on or before October 24.

On October 11, in another letter to Voss, Iwersen said: "Your situation over there

[2] The agreements on this subject are not too clear. However, the balance-sheet of Graef & Schmidt, as of December 31, 1938, does not disclose this claim. The balance-sheet of the estate, as of June 30, 1939, shows the following item: "E. Iwersen (Graef & Schmidt, Inc.) $75,000."

[3] See the preceding note as to the obligation of Graef & Schmidt, Inc., on this debt.

[4] With the possible exception of one so-called "personal" letter from Voss to Iwersen, dated November 8, 1939, discussed below.

is not enviable, particularly if the war should last a longer time. I welcome your plans to reduce the overhead to a minimum. But I am of the opinion that, as soon as it becomes obvious that the war will last for a long time, one should proceed cold-heartedly, that is in other words, you and Hermann must liquidate the part of the business which is based on import, i. e., the stock of goods must be sold out as quickly as possible without considerable overhead expenses and also the overhead for the office must rigorously be curtailed. You must really reduce everything in proportion to the factory and attempt to *drag through* with an extremely small staff of people in conjunction with the factory."

On October 24, the law firm of O'Connor & Farber, acting on behalf of the trustees, wrote a letter to Henckels, K. G. and Iwersen. The lawyers called attention to the fact that, as the $130,000 of debts were in default, the estate could foreclose on the stock, but offered, for the estate, to release those debts in consideration of the transfer of the Graef & Schmidt stock to the estate. The letter stated that if this offer was acceptable, its acceptance should be by cable. On the same date, the lawyers wrote Iwersen, asking him to write a letter stating that, as trustee, he consented to the offer; it also asked him to send his key to the safe deposit box.

On November 6, Henckels, K. G., and Iwersen cabled their acceptance; they confirmed the same in a letter of that date. However, on the same day, November 6, Iwersen sent a letter to O'Connor & Farber, saying that he had forwarded the key to Voss, and concluding with this paragraph: "If we have given our unconditional consent it is with the clear understanding that the Estate will pay itself by administrating or possibly liquidating the corporations of our property, and, therefore, all values saved over and above the claims of the Estate of Hermann Kind will be held at my disposal or at the disposal of J. A. Henckels Commandit-Gesellschaft as the interests may be. In due time we expect a full and detailed statement of all transactions made."

On November 7, Iwersen sent Voss a letter, No. 269, saying in part: "J. A.

Henckels and I with great faith have placed the fate of our interests and the responsibility in the hands of yourself and Hermann. * * * It is entirely self-evident that when the time comes we shall expect an exact reckoning with respect to the events which will now take place and the fullest responsibility now rests on the shoulders of Hermann Kind. I should like sincerely to ask both you and Hermann always to consider all steps which you take also in such a way as to protect our interests here. I gave a pledge to the Foreign Exchange authorities that our firms over there would be in the best of protection in the hands of the Trustees and that nothing will occur which we might later have cause to regret."

On November 14, Voss, in a letter No. 319, to Iwersen, said: "I was informed that they [O'Connor & Farber] did not like the last paragraph * * * of your letter of November 6 * * * They feel that this would give an opening to a possible U. S. A. Alien Property Custodian * * *"

On November 28, O'Connor & Farber wrote Iwersen a letter, rejecting the condition set forth in the last paragraph of his November 6 letter, and asking that, "in order to clear up this matter," Iwersen and Henckels send a letter of unconditional acceptance. But on the same day, November 28, Voss, in a letter signed by himself and Hermann Kind, wrote Iwersen a letter (in response to his November 7 letter, No. 269) as follows: "I refer to your letter No. 269 and in particular to the second and third paragraphs. Both of us, i. e., Hermann and I, are very much conscious of the trust which the firm Henckels in Solingen places in us, and at the same time we also know precisely the great responsibility which we have assumed in these matters. You may rest assured that Hermann, as well as I, will carefully discuss and consider, in co-operation with Mr. Bonner, all steps which we undertake, and that everything is being done in order to safeguard the interest of the firm Henckels. I would like to refer in this connection also to your letter #273 in which, on the second page, you expressed fears that it could perhaps be possible that Hermann and I do not pull together. I had telegraphed already in my cable of the 24

inst. the words: 'Full cooperation with Hermann never disturbed,' and I did this in order to clear out of the way any apprehensions which you expressed in this connection. In supplementing this, I still would like to add that the best harmony exists between us, and that we confer about all matters which could ever happen, and that a definite decision is only reached after a thorough discussion. Therefore, you do not need to be concerned at all in this connection, and you may be assured, as I already mentioned above, that everything is being done to bring these difficult transactions to a conclusion in the right manner."

On the same day, November 28, Voss wrote Iwersen a so-called "private" letter which is not in the record. At the trial, Voss testified that, in that letter, he assured Iwersen that the transfer of the stock to the estate would be on the condition that the estate would use the assets only in an amount sufficient to pay itself its $130,000 claim. Hermann testified that he had not seen this letter; but it was referred to, and its contents stated, in a letter of January 6, 1940, from Iwersen to Voss; Iwersen referred to the latter letter in a letter of the same date, January 6, to Hermann, to which, as noted below, Hermann replied on January 18 and January 20, 1940.

On November 29, Iwersen wrote Voss, in a letter No. 280, that he and Henckels "must * * * receive a receipt in full and at the same time assurance that any surpluses whatever after the payment of our debts are returned to us."

On December 1, Iwersen wrote Voss, in letter No. 282, as follows: "Referring to letter #319 I am sending you enclosed a version of my letter of November 6 to O'-Connor and Farber in which I omitted the last paragraph. I am doing this already today because I am anxious that you get this letter soon. Maybe it would be a good thing for Farber to have both letters so that he can use whichever one he considers proper."

On December 5, Hermann Kind wrote Iwersen this: "It has been a long time since I have written to you, but both Voss and Bonner have kept you informed regarding developments here and have, of course,

thoroughly discussed every matter with me before writing to you. I only wish to say here that Voss and Bonner and I are working together in the closest possible harmony and with a very deep and sincere realization of the serious responsibility which rests on our shoulders. You may be sure that we are all doing our level best to handle each problem in the best interests of all parties concerned. I am very thankful that we have two such men as Voss and Bonner to work with during this great emergency."

On December 12, Voss wrote Iwersen: "The receipt in full cannot be issued as yet because the shares have not been transferred as yet. In spite of the fact that we have been pressing the lawyers continuously they refuse to make this transfer at this time * * * We were informed, however, that the document which you sent to them under date of November 6th * * * has been cancelled as far as the law is concerned by your letter of even date and in particular by the last paragraph on the first page. * * * Everything which happens here is discussed with Hermann and Mr. Bonner and both of them read your letters as well as mine, in fact your letters are not answered before we had a thorough discussion about them and the answers to be given."

Also on December 12, Iwersen and Henckels sent O'Connor & Farber a letter unconditionally accepting the offer.

On December 18, Hermann Kind wrote Iwersen as follows: "I should like to state again that Mr. Voss, Mr. Bonner and I have constantly been working in the closest cooperation and assure you that every letter from you and J. A. Henckels since the beginning of the war has been carefully studied by me. The same is true of every letter which was written to you by Mr. Voss or Mr. Bonner. * * * That I did not write to you sooner was only because I felt that Mr. Voss in his letters had given you all the information regarding the events as they were taking place here and that I would only be repeating facts which were already known to you. We hardly felt that it would be worthwhile to relate at great length to you all the small details of our many conferences—the important thing to get over to you was the decisions

we had reached and the plans we had formulated."

On January 6, 1940, Iwersen wrote Voss, in letter No. 304, in answer to the "private" letter of November 28, as follows: "On November 28 you wrote me a letter without a number from which I see that you understand completely that the transfer of the shares in place of payment is a pure formality; that, of course, one day, an exact settlement must take place. * * * You know that I gave a solemn promise to the Henckels firm and the Foreign Exchange Control that the whole matter would be properly taken care of. That is to say: I assured them that the firms over there were transferred to the Estate on a confidential basis, on the self evident condition that the Estate would claim the assets of the firms only in the amount necessary to satisfy its claim of $130,000. In other words, the real worth of the firms over there is considerably greater than $130,000 —and some day everything over $130,000 must be refunded. We can talk later about the form in which this repayment should be made; but it must be perfectly clear to you, as manager whom we have appointed as well as to Hermann and his mother. The lawyers do not need know anything about this but the brothers and sisters of Hermann should, so that there will not be any unpleasant controversies later on. I have tried at various times to suggest to you in my correspondence to get Hermann to write to me in the sense outlined above; but nothing has happened so far. As I have said, such a letter has nothing to do with the steps which the lawyer takes. We only want confirmation with regard to our mutual understanding in the matter. Please get Hermann to write me this letter as soon as possible; and I would be grateful to you if you would help him in drafting the text."

On the same day, Iwersen wrote Hermann letter No. 5 reading as follows: "Today I wrote again to Voss in detail and requested a letter from you in which once more you and your relatives should confirm the manner in which the transfer of the shares to the Estate is to be understood. Will you please send the requested letter here as quickly as possible and not

let yourself be influenced by the lawyers. The lawyers need not know anything about the letter. Legalistically, the matter is as the lawyers have described it but in reality and in view of our confidential relationship the matter is nevertheless somewhat different."

On January 18, Voss sent a cable to Iwersen reading as follows: "Received 303,304 and Hermann five prefer again in the interest of Henckels not in the interest estate to point out that due to desired letter in the event of war everything over $130,000 could be seized stop cable whether you request confirmation in spite of this stop estate willing to give this stop lawyers have nothing to do with this."

On January 20, 1940, Hermann Kind, referring to Iwersen's letter No. 5 of January 6 to him, wrote, "Your letter #5 has been answered by our wire of January 18 and we await your further instructions before proceeding with this matter." (The words "our wire of January 18" should not be overlooked.) At the trial, Hermann testified that he had "agreed to the sending of that telegram" of January 18; he added: "That was not a telegram from the estate and we did not understand that would be binding the estate."

On January 20, Hermann and Johanna, as trustees, sent Iwersen and Henckels a letter, dated January 15, reading as follows: "We acknowledge receipt of your letter of December 12, 1939, addressed to our attorneys, unconditionally releasing all your right, title, and interest in and to the securities named therein. Accordingly we hereby affirm that J. A. Henckels Kommandit-Gesellschaft and Emilio Iwersen individually are released from all obligation with respect to the $130,000 indebtedness for which such securities were pledged to the Estate of Hermann Kind." This letter was received on or about March 13, 1940.

On January 20, 1940, Iwersen wrote Hermann letter No. 6 reading in part as follows: "Today we received the long telegram from Voss in reply to my letter No. 304. We were very surprised that you telegraphed about such a thing at all. I must say we never thought it possible that you could be so clumsy. We did not want any official documents from the Estate

but as letter No. 304 explained clearly enough we simply wanted a private assurance from yourself. Therefore a couple of lines would have sufficed as, for example, 'of course we agree to all points mentioned in your letter No. 304.' You could have signed and both your mother and two sisters could have signed their names. In this way we should have had the facts straight amongst us so that if unluckily one of us should die the survivors would know what had been agreed. But judging from your telegram you seem to have doubts; for this reason we are no longer insisting on a declaration. I must say however that we were very astonished, for in our opinion the official matter would not have been jeopardized in any way. Proof that I am right is to be had in Voss' telegram where he writes that the Estate is willing to give assurance. But as I have already said we do not want a document from the Estate under any circumstances, we only want a private communication."

On April 12, 1940, replying to this letter, Hermann wrote Iwersen: "Your letter #6. There is really nothing further which I can write to you on the subjects discussed here. Mr. Voss has written you several letters explaining our reasoning in this matter, and I believe we should now let it rest until we can have a personal discussion about the whole thing at some future time."

On June 11, 1940, Voss wrote Iwersen: "I shall refer first to Mr. Bonner's letter No. 342 of December 26, 1939. In this letter he writes that, after the Estate became owner of the business, a way would have to be found whereby all dividend payments would be looked upon as repayments on the capital investment and not as income. In answer to this letter you wrote concerning the same matter in your letter No. 310, paragraph 21. You expressed the hope that we would proceed with the greatest care in this connection. Of course, we went over the matter many times in detail with the lawyers and we decided that the only sure and correct solution was to start liquidation of the firm. After we have declared our intention to liquidate the firm we shall have a full three years to carry out the liquidation. It is more or less a matter of form, and the only reason for it is, as you know, that otherwise all repayments to the Estate would be considered as income instead of repayments on the capital investment. The income of the Estate is naturally subject to tax. After the commencement of the liquidation, on the other hand, we can declare a liquidating dividend which is not subject to tax and which will be entered on the books. In principle you are right of course that in case of a liquidation assets such as furniture, machines, etc. must be sold, but we do not have to let things go that far. Such assets could also be taken over by a firm to be then newly organized."

On October 21, 1940, Bonner wrote Iwersen: "In case of a sale of the remaining assets to a new firm which is to be established in order to maintain our factory, it would be of importance that the sale price—which from our point of view should, of course, not be higher than the unpaid balance of the debt to the Estate at the time of the sale—is an equitable one and can be justified. We have this information from our lawyers who have mentioned this point on several occasions. The reason is that we must be able to prove without difficulty to the Surrogate's Court, from the audit of the books at the time of the final settlement of the Estate and the discharge of the trustee, that a sale price corresponding to actual values was obtained. In other words: Assuming that the book value of the firm at the time the sale to the new firm is $50,000, just to mention a figure, and that the debt to the Estate still amounts to $10,000 then the sale price should not be higher than $10,000, as a repayment of a possible surplus by the Estate to Solingen probably would not be permissible from the legal point of view, especially under the strict rules of the Surrogate's Court. A sale for $10,000 would, however, be looked upon as a 'dissipation of assets' because the difference between the selling price and the book value would be too great. We should like to add that the figures and percentages used are not necessarily exact but should only serve as an illustration. We are mainly interested in hearing

your basic reaction to the proposed write-offs."

On November 15, 1940, Iwersen wrote Voss concerning Bonner's letter of October 21: "I have received the statement from Mr. Bonner and have read through his remarks. I assume that these remarks have been approved in all of their details by you also. I am in agreement with the plans developed by Mr. Bonner and the way in which he wishes to make the next balance-sheet, but I should like to suggest to you that besides the official balance-sheet, in which the more considerable write-offs appear, another balance-sheet be drawn up, from which it may be seen what the situation would have been if the write-off had not been made. In other words, I should like, if only for reasons to be considered in connection with a later accounting by the Estate, to have no assets disappear in silence, which would happen if certain constituent parts of the inventory were decreased in value. You and Mr. Bonner must see to it that we are later in a position to reconstruct a proper picture. This would not be possible if we do not carefully retain the write-offs in figures."

November 26, 1940, Bonner (in a letter initialed by Hermann) wrote Iwersen as follows concerning life-insurance policies on Iwersen's life which were payable to Graef & Schmidt: "In case anything should happen to you, the amount of the insurance, of course, after deduction of the loan, would go to the firm of Graef & Schmidt, Inc., and thus to the Estate. Although a possible surplus would be treated in accordance with the viewpoints set out in Mr. Voss' letter of November 28, 1939, the purely legalistic basis is nevertheless entirely different, because the unconditional transfer of the shares does not permit a refund of a possible surplus. As we wrote to you in our letter No. 424, paragraph 15, a surplus in the liquidation of the firm can be compensated for by write-offs and subsequent formation of a new firm. But should the proceeds of the insurance be paid out prior to the founding of the new firm great difficulties would have to be reckoned with. The whole matter is perhaps far fetched and we certainly hope

that payment will not occur under such circumstances. Nevertheless, we think that an effort should be made to make sure that such a large amount will revert to those interests—in this case Solingen—which, for many years, have paid the premiums, without having to fear that a refund from the Estate to Solingen could possibly be contested."

December 4, 1940, a special meeting of the stockholders of Graef & Schmidt, Inc., resolved that the company should gradually liquidate, the liquidation to be completed by December 31, 1943.

February 3, 1941, Iwersen said in a letter to Voss: "After the estate has been satisfied what is left belongs to us and nothing can change this fact. It was under this condition that the transfer was made and though for formal reasons this transfer was unconditional, nevertheless all of you are fully and completely informed concerning the real state of affairs." Voss, replying to this letter, on April 10, 1941, did not dispute that statement.

Johanna Kind testified at the trial that she had heard of Iwersen's proposal that the surplus over the $130,000 be regarded as belonging to the Germans, but that she could not remember whether she had learned of it at the time of the transfer of the stock. She said she had then accepted Hermann's word as to what was being done; that she trusted Hermann "to take care of everything"; and that, while he "would explain things in a general way" to her, "in general" she "left almost everything to him, the details."

Hermann testified that Johanna had taken no part in conferences with O'Connor & Farber, adding, "The whole subject had been discussed with her, and she left the details in my hands, in the hands of O'Connor and Farber, but she was aware of what we were trying to do." He also testified that, when the cable of January 18 and the letter of January 20 were sent to Iwersen, he had not consulted her "as to her willingness to transfer any possible surplus to" the Germans. The trial judge found that Hermann had no authority from Johanna to make the "representations" con-

tained in that cable and that letter, and that she "never agreed in any way that the sale was anything other than complete or authorized her son or anyone else to express her agreement to any suggestion that they did."

At the time of the alleged sale of the Graef & Schmidt stock to the estate, Graef & Schmidt owed Henckels $134,000. It also owed other creditors (not including the estate's claim of $75,000) in amounts not entirely clear from the record, but which appellees say aggregated some $85,000. Assuming that figure to be correct, the total debts of Graef & Schmidt were then $229,000. In so far as the debit of Iwersen to the Estate in the amount of $75,000 was also a debt of Graef & Schmidt, the trustees purported to release it on January 20, 1940, as noted above. The Graef & Schmidt stock then had a book value of $145,000; but Hermann Kind testified that he doubted whether it "would bring $130,000."

By August 25, 1941 (if not sooner) Graef & Schmidt, with Hermann Kind now as its president,[5] paid Henckels its claim of $134,000. By that date, the estate had received as regular and "liquidating" dividends from Graef & Schmidt but $38,000. In October and November 1941, the estate received further "liquidating dividends" of $25,000. By that time, all creditors of Graef & Schmidt had been fully paid. Further payments by Graef & Schmidt to the Estate were prevented by a "freezing order." Accordingly, on its original claim of $130,000, the estate received but $63,000. After the seizure by the Alien Property Custodian in 1943, the company's business and earnings substantially increased.

### Our Conclusions

■ 1. The trial judge held that the sale of the stock was valid and bona fide. We cannot agree. We first note that the judge, in his findings and opinion, did not discuss the following aspect of the facts which illuminate the nature of the transaction.

As above noted, when this transfer occurred, Graef & Schmidt owed Henckels $134,000 out of a total of debts of not to exceed $219,000. As the $130,000 debt

of Henckels to the estate was then in default, the estate could immediately have foreclosed on, and sold, the stock, bought it in, and, if the sale price did not pay the estate's claim in full, could at once have attached the $134,000 claim of Henckels against Graef & Schmidt. Indeed, in their letter to Iwersen of November 28, 1939, O'Connor & Farber said: "As we indicated to you in our letter of October 24, 1939, because of your default in the payments due to the Estate, the Estate could proceed to foreclose the collateral or it could acquire ownership thereof by agreement with you. If we took action to foreclose, we should probably put up the stock of all three corporations for sale at auction to the highest bidder. If the sale did not produce a purchaser for $130,000, we could then obtain a deficiency judgment against you and the German partnership for the difference between the amount realized and the full amount of the debt."

Had the estate thus proceeded, it would have become owner of the stock; but it would also have become a creditor of Graef & Schmidt in an amount ample to pay any deficiency (after the foreclosure sale of the stock) on its $130,000 claim, provided only that Graef & Schmidt was solvent. It was solvent if, as the trustees then believed, its stock had some value.

Instead of taking this obvious step, the estate (if we assume the sale was valid) cancelled its claim against Henckels and took the Graef & Schmidt stock, which Hermann testified would not "bring" $130,000. In so doing, the estate accepted a position, with regard to the assets of Graef & Schmidt, junior to Henckels' $134,000 claim. Although, according to the appellees, business was then "bad," and although it did not improve until 1943, Graef & Schmidt, with Hermann as its president, by August 25, 1941, had paid Henckels its $134,000 claim in full, but, by the end of 1941 had paid the estate (in regular and "liquidating" dividends) only $63,000. Had the estate acquired, as it could, both the stock and the $134,000 claim, it, instead of Henckels, would have been paid in full by August 25, 1941. These facts shriek for explanation.

---

[5] He became president in 1940.

The trustees in their brief say that their failure to foreclose and also to attach the $134,000 claim "conformed with normal commercial motives," and that the trustees "were under a personal incentive to get at least $130,000 out of the corporation for the estate", since otherwise "they might be surcharged for any resulting loss." It is patent that the failure to acquire the $134,000 claim did not "conform with normal commercial motives." There was no business reason for so arranging matters that Henckels' $134,000 claim should be paid before the estate was fully paid. The estate, before the alleged sale, had no interest, except as a creditor, in the stock of Graef & Schmidt, and, accordingly, once its claim was paid, would have had no business motive for retaining the good-will of the Germans after the war.

Nothing in the evidence supplies even a faint hint of any business-like motive for the course adopted by the trustees. In their brief in this court, the trustees attempt such an explanation as follows: "It would have been preposterous for the trustees to allow a German national to remain the sole stockholder indefinitely while debts were being paid, and run the risk of our country becoming involved in the war and having the Alien Property Custodian take over the corporation. The trustees had a real duty to protect the estate and it was perfectly proper for them to try to avoid just such a danger." The implication is that, had the Germans remained the owners of the stock, and had it been seized by the Alien Property Custodian, the Alien Property Custodian would have so mismanaged Graef & Schmidt that it would have been unable to pay any substantial part of the $134,000 claim. No such explanation was even intimated, either when the transaction occurred or since then, until this litigation arose. But, aside from its being belatedly advanced, this explanation is fatally defective. For, if the estate had, in good faith, foreclosed on the stock and attached the $134,000 claim, no German national would have remained the stockholder and there would have been "no risk of having the Alien Property Custodian take over the corporation." It is of interest, too, that, as the evidence discloses, the company prospered after the Alien Property Custodian took over the management in 1943.

The action of the estate deviates so strikingly from normal business behavior that we think it incredible that the purchase of the stock and the release of the $130,000 claim were in good faith.[6]

2. The trial judge's findings and conclusions are unacceptable for another reason. His position, and that of appellees, may be briefly stated thus: (a) The estate and Iwersen and Henckels entered into a transaction of purchase and sale. (b) This transaction was valid and binding unless there was an equally-binding contemporary or subsequent "side" agreement. But there was not. For the estate, under New York

[6] Hunter v. N. Y., O. & W. R. R. Co., 116 N.Y. 615, 23 N.E. 9, 6 L.R.A. 246; Gurley v. Missouri Pacific R. Co., 104 Mo. 211, 16 S.W. 11, 17; New York & Bklyn. Ferry Co. v. Moore, 102 N.Y. 667, 6 N.E. 293; Whelen v. Osgoodby, 62 N.J.Eq. 571, 50 A. 692; Vreeland v. Vreeland, 48 N.J.Eq. 56, 21 A. 627; Gardner v. Weston, 18 Iowa 533, 535; Lee Sing Far v. United States, 9 Cir., 94 F. 834, 838; Chandler v. Town of Attica, C.C., 22 F. 625, 627; Gorman v. Hand Brewing Co., 28 R.I. 180, 66 A. 209; Gardner v. Gardner, 2 A.C. (Eng.) 723, 730, 736; Sharpe v. Crispin, L. R. P. & D., 611, 621; Murray v. White, 9 F. 562, 564; The Gratitude (The Eutaw), D.C., 14 F. 479, 481; The El Dorado, D.C., 27 F. 762, 763; Smith et al. v. Davis, C.C., 34 F. 783, 787; The America, D.C., 95 F. 191, 192; Wood v. Hubbell, 10 N.Y. 479, 481; Morrison v. Dominion National Bank, 169 Va. 191, 192 S.E. 707, 711; Moore, Facts (1898), § 32, § 137; The Dauntless, 9 Cir., 129 F. 715, 721; Allen v. Collins, 8 Cir., 52 F.2d 708, 709; Fire Ass'n v. Weathered, 5 Cir., 54 F.2d 779; Quock Ting v. United States, 140 U.S. 417, 420, 11 S.Ct. 733, 851, 35 L.Ed. 501. Cf. American Casualty Co. v. Windham, 5 Cir., 107 F.2d 88, 89; Ramopa Co. v. A. Gustun & Co., D.C., 278 F. 557. Cf. Stöhr v. Wallace, 255 U.S. 239, 255, 41 S.Ct. 293, 65 L.Ed. 604; Stöhr v. Wallace, D.C., 269 F. 827. In Baldwin v. Whitcomb, 71 Mo. 651, 659, the court said that "whenever fraud is the matter in issue, * * * any unusual method of transacting the business * * * is itself a badge of fraud." In Comstock v. Rayord, 12 Smedes & M., Miss., 369, 395, the court said: "When the part is overacted, the delusion is broken and the fiction appears."

decisions,[7] could be bound only by the unanimous consent of its trustees, since there was no provision in the will to the contrary; and, as Johanna, one of the trustees, had no knowledge of this "side" agreement, she never assented to it.

We cannot concur, although we accept the trial judge's finding of Johanna's lack of knowledge. We accept that finding reluctantly, as it is based on Hermann's testimony, which we regard as somewhat fishy: The judge acknowledged that Hermann, having read the Voss letters,[8] was "under an obligation" to contradict the impression they must have created; and nowhere in his testimony or elsewhere did Hermann explain why he did not, at the time, tell his mother of the contents of those letters, or of the cablegram of January 19, 1940, or of his letter of January 20, 1940. Nevertheless, as the judge saw and heard Hermann testify, we must yield to the judge's determination that Hermann told the truth when he testified that, at the time of the transfer, he told his mother nothing about this correspondence. Even so, we conclude, for the following reasons, that no actual purchase and sale occurred:

(1) Disregarding Iwersen as trustee, the assent of the estate required—as the estate in its brief strenuously asserts—the concurrence of the other two trustees, Hermann and Johanna. (2) We think that the evidence, narrated above, plainly shows that one of these two, Hermann, intended that the seeming purchase of the stock by the estate should not be a reality but a mere form employed to deceive the United States. In so concluding, we rely on the documentary evidence which we are in as good a position as the trial judge to interpret; and we take into account the correspondence both before and after the purported consummation of the sale; for, in judging intention, especially where fraud (or the like) is in issue, prior and subsequent statements of the parties are admissible.[9] (3) The estate thus never gave a real assent, since one of its trustees, Hermann, did not intend to assent. (4) This fact was known to Iwersen and Henckels, K.G., the alleged sellers of the stock.

We might stop there: No sale results where one party to an outwardly seeming sale knows that the other does not mean his words or acts to be taken seriously. But here the facts are even stronger, for the alleged sellers did not intend the sale to be a reality, and the estate was on notice of that fact through notice to Hermann, one of the trustees.[10] If the parties to a written agreement expressly stipulate in the writing that it is to give rise to no legal relation, that stipulation will render the agreement unenforceable.[11] If they so stipulate orally, or in other writings, at the time when they make the written agreement, the result is the same. See New York Trust Co. v. Island Oil & Transport Co., 2 Cir., 34 F.2d 655, 656; In re Hicks & Son, 2 Cir., 82 F.2d 277, 278; Corbin, The Parol Evidence Rule, 53 Yale Law J. (1944) 603, 615-617; Williston, Contracts (rev. ed. 1936) 35-37; L.R.A.1917B 263;

---

[7] Brennen v. Willson, 71 N.Y. 502; Fritz v. City Trust Co., 72 App.Div. 532, 76 N.Y.S. 625, affirmed 173 N.Y. 622, 66 N.E. 1109; Striker v. Daly, 175 App.Div. 620, 162 N.Y.S. 527; People v. O'Loughlin, 79 Misc. 650, 140 N.Y.S. 488; Townsend v. Winburn, 107 Misc. 443, 177 N.Y.S. 757; Scott, Trusts, § 194.

[8] Except, said the judge, the "private" letter of November 28, 1939.

[9] United States v. Rubenstein, 2 Cir., 151 F.2d 915, 917; In re H. Hicks & Son, 2 Cir., 82 F.2d 277, 279; Summers & Brannin v. A. Roos & Co., 42 Miss. 749, 790, 2 Am.Rep. 653; Klein v. Hoffheimer, 132 U.S. 367, 373, 10 S.Ct. 130, 33 L.Ed. 373; Com'r v. Dyer, 2 Cir., 74 F.2d 685, 686; Richardson v. Smith, 2 Cir., 102 F.2d 697, 698, 699, 125 A.L.R.

774; National City Bank v. Helvering, 2 Cir., 98 F.2d 93, 96.

[10] At no time did Hermann, directly or through Voss, object to the condition stated in Iwersen's letter of November 6, 1939, as a variation from the true understanding. If Hermann did not mean to acquiesce, he had an obligation to say so. At the trial, Hermann did not deny his responsibility for the assurances given to Iwersen, except to say that he thought the cable of January 18, 1940, did not bind the estate.

[11] Rose and Frank Co. v. J. R. Crompton & Bros. Ltd. [1923] 2 K.B. 261 [1925] A.C. 445; Cheshire and Fifoot, Law of Contracts (1945) 77, 78; cf. Richardson v. Smith, 2 Cir., 102 F.2d 697, 699; Com'r v. Dyer, 2 Cir., 74 F.2d 685, 686.

Restatement of Contracts. § 71(c); Cheshire and Fifoot, Law of Contracts (1945) 75.[12] Had Iwersen and Henckels connived with Hermann to deceive Johanna, it might conceivably be argued that there was a sale by way of estoppel. But we need not consider that possible argument for this reason: There is no evidence that Hermann attempted to deceive his mother; and, even if he had, there was nothing to bring that fact home to Iwersen and Henckels.

■ As, then, the transfer of the stock was fictitious, its beneficial ownership remained in the Germans and was therefore subject to seizure by the United States.[13] However, since we hold that the sale never occurred, it follows that the estate retained its claim for $75,000 against Graef & Schmidt, and may therefore keep, as in reduction of that claim, the "dividends" it received.[14] The estate also retained its pledgee's lien on the stock, and is therefore now entitled to assert that lien for the unpaid balance of its claim. Since we accept the judge's finding as to Johanna's lack of knowledge, we cannot hold that the estate, as such, is to be regarded as a wrongdoer. In the light of the foregoing, there is no need to consider (a) appellant's contention that Graef & Schmidt was "controlled" by "foreign nationals," and therefore the estate may not seek a revesting of the stock, or (b) his contention that the estate may not recover the stock under § 9(a) of the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 9(a).

The dismissal of the counterclaim is affirmed. To the extent that the judgment revested title to the stock in appellees, it is reversed. We remand for a determination of the amount of appellees' lien on the stock and for relief with respect thereto.

[12] As to the "objective" (or "external") theory, see Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 760–767; cf. Zell v. American Seating Co., 2 Cir., 138 F.2d 641, 646–648. Even if the "external" theory be accepted without qualification, yet, of course the "internal" fact of one party's lack of intention to contract, if known to the other party, may always be shown.

It has been held that the parol evidence rule does not affect the right of a third person, not a party to an agreement or in privity with a party—and especially the government—"to go behind the written contract to discover the true facts." Stern v. Commissioner, 2 Cir., 137 F.2d 43, 46. But see Corbin, Parol Evidence Rule, 53 Yale L.J. (1944) 602, 662.

[13] Cf. Hodgskin v. United States, 2 Cir., 279 F. 85; Stöhr v. Wallace, D.C., 269 F. 827, affirmed sub nom. Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604; Standard Oil Co. v. Markham, D.C., 64 F.Supp. 656, 664, 665.

[14] This is true even if that claim merely entitled the estate to be paid out of the company's profits.